IN THE MATTER OF THE CLAIM OF PAUL JEN-
SEN, an Employee of Manning and Brown, Inc.,
now Fred M. Manning, Inc., Made under "Work-
men's Compensation Law".

PAUL JENSEN, *Employee-Claimant and Appellant,*

vs.

MANNING AND BROWN, INC., now FRED M.
MANNING, INC.,
*Employer-Defendant and Respondent.*

(No. 2358; April 1st, 1947; 178 Pac. 2d. 897)

For the appellant the cause was submitted upon the brief of Ingle and Ingle and Lyman B. Yonkee all of Thermopolis, Wyoming, and oral argument by Chester Ingle, Jr. and Mr. Yonkee.

For the respondent the cause was submitted upon the brief of Edward L. Wood of Denver, Colorado, and William H. Brown, Jr. of Casper, Wyoming, and oral argument by Mr. Wood.

92

## OPINION

RINER, Chief Justice.

This case presents the question whether under the Workmen's Compensation Law of this state and the material facts disclosed by the record, the claimant below and appellant here, Paul Jensen, who was seriously injured in an automobile accident on the 7th of July, 1945, should properly be entitled to an award for compensation, medical and hospital expense. Manning and Brown, Inc., now Fred M. Manning, Inc., the employer, resisted payment of these claims from the Workmen's Compensation Fund. The district court of Hot Springs County after trial at which both parties introduced evidence, decided that Jensen was not so entitled and disallowed his claims for an award in these matters. He has brought the record and judgment here for review by direct appeal.

The important facts which should operate to control the disposition of this case are not very greatly in dispute and as we find them to be, are:

Manning and Brown, Inc., hereinafter usually referred to as the "company" or the "employer", on the 7th day of July, 1945 was engaged in drilling an oil well in the Buffalo Basin oil field, Park County, Wyoming. They employed at that well as tool-pusher one John Lorenz and as driller a man named Emile A. Long. The latter had hired a drilling crew and Paul Jensen, above mentioned, Robert and William Pebbles, and Charles Edwards were members of it. Long and these four men each had their homes in the town of Thermopolis, Hot Springs County, Wyoming, which was located about fifty miles distant from the oil well where they were all engaged in the drilling operations. These employees were obliged to live in Thermopolis as there were no adequate accommodations in Meeteetse, the

town nearest the well, or at the well site. They traveled to the well each morning and returned home each evening after their duties there had been performed, by means of automobiles owned by some members of the crew. These men, aside from the driller received about a dollar an hour for their work. Usually the driller, Long, drove his own car for this transportation though when his car was laid up for repairs, another member of the crew who owned a car carried the men to and from the well.

Prior to October 23, 1944, the company did not concern itself with the matter of transporting its drilling crews in connection with their employment. On the date last mentioned, the nation being still involved in war conditions, the company inaugurated a new practice or plan relative to this matter. In his testimony given on the trial of this case the treasurer of the company explained the reason for its adoption as follows: "Well, it was becoming more expensive all the time for the men to have their cars repaired, and they were unable to purchase new cars and replace those worn out, also became difficult to find housing facilities in the proximity of the well, and consequently to more or less reimburse the employees for the additional expense which they were being put to travel to work and having to have their cars repaired from time to time, at the high costs at that time, we inaugurated this plan of paying one man on each crew seven cents a mile travel allowance."

Upon application to the War Labor Board by the employer for authority to pay this travel allowance, that body gave its approval thereof and thereafter the company appears to have adhered to the proposed plan for transporting its drilling crews to and from the wells where they were employed. This was the plan that was in operation on July 7th, 1945 at the Buffalo Basin oil well heretofore mentioned and under which plan Long and his drilling crew worked.

The recognized practice under this new compensation arrangement was: no members of this drilling crew paid transportation fare to anyone, nor was anyone paid anything by the company with respect to their being carried to and from the oil well site to the place where they resided except those employees who furnished conveyances and that amount was as stated above. In other words, one or more of the men carried the rest of the crew in his car, he who furnished the conveyance to be reimbursed on the mileage basis already indicated for the distance driven. The particular automobile to be used could be decided upon from day to day by the men themselves, the company not knowing in advance unless incidentally, who was to take whom. Though, as heretofore stated, the driller, Long, usually drove his own car and carried the rest of his crew with him to Thermopolis and back to the well site each day unless it happened his car was in the shop for repairs. In the latter event as before observed, one of the crew who had a car and was willing to drive it acted in Long's stead and, of course, was paid on the mileage basis aforesaid. Just here it may be noted that Jensen, the claimant aforesaid, during all the time he worked for Manning and Brown did not own any car himself.

A report was made each month by the driller, Long, to the tool-pusher, Lorenz, in the form of an expense account showing the places from which and to which the crew traveled, the number of miles traversed and this report was forwarded by the tool-pusher to the general office of the company where the proper amount to be paid by it for this service was calculated. The driller, Long, was the man required to keep track of this account for transportation and also to turn it over to the tool-pusher for transmission to the company's general office. He kept no account of who drove the car

to carry the crew back and forth from their homes to the well site. The checks for this travel expense were made payable to the driller, Long, for convenient accounting purposes. It was this employee's duty to see to it that the man who used and drove his car for this purpose received the proper mileage payment, i. e., to pay either himself or pay whoever transported the crew. For example, Long made the report that he had driven mileage entitling him to $98 the month preceding July 7th, 1945. The crew did not, of course, receive transportation unless they work "on tower" as the record states, the word "tower" meaning the same as "shift" in mining parlance. 42 Words and Phrases 103; Morrison-DeSoto's Oil and Gas Rights, p. 979 defines "Tower" as:

"Tower. A day's work of a drilling crew. A tower runs from 12 noon until 12 midnight; and from midnight until noon."

So the record tells us that eight hours was the "tower shift" at the oil well.

The distance traveled by the crew was required to be reasonable in view of circumstances, otherwise the company would not pay the mileage allowance. The crew was not paid for the time spent in traveling to and from the well but anyone hauling these men had authority to transport them to and from Thermopolis to the well. They were paid for their time spent at the well. The treasurer of the company, however, answered the following questions on cross examination thus:

"Q. But you did pay for the transportation, didn't you?

"A. We paid whoever used their car to do the transporting.

"Q. These men really got their transportation in addition to their wages?

"A.    That is correct."

And on re-cross examination, the same witness responded to these additional inquiries in this manner:

"Q.    You were paying the money, were you not for this transportation?

"A.    If they worked tower, yes.

"Q.    You didn't pay one man, but you paid for the transportation of the crew?

"A.    That is correct."

On July 7th, 1945 the drilling crew aforesaid left the drilling rig in Buffalo Basin about 4:00 o'clock in the afternoon to go to their homes in Thermopolis. They had been working continuously for sixteen hours in setting oil well pipe and all were tired. In consequence everyone was asleep except the driver of the car in which they were driving, during the major portion of the journey to Thermopolis. At a point about fifteen miles from the town, the accident in question happened. The automobile, at that time being driven by the driller, Long, left the oiled surfaced highway and according to the testimony of the Sheriff of Hot Springs County who came to the scene of the accident shortly thereafter, the driller's car "traveled about 90 feet after it left the road, in the borrow pit, hit an embankment and jumped in the air 85 feet, came down on the inside of a drain, beside of the culvert, came up right side down in the pit." The officer further testified that he "found the motor driven nearly to the front seat. The front end of the car entirely demolished, and also the back end, where it came down on the culvert and then came right up. The speedometer stuck at 65 miles an hour." The driller and driver of the car, Long, lost his life in the accident and the claimant, Jensen, sustained a fracture of the lower end of the right femur, a broken tendon in his left leg and

sundry contusions and abrasions. He was unconscious when taken to the hospital in Thermopolis.

The case was tried to the court without a jury with the result hereinbefore stated.

The Workmen's Compensation Law of this state provides in subdivision (1) of Section 124-106-7 W. R. S. 1931 as finally re-enacted in Section 2 of Chapter 128 Laws of Wyoming, 1937 (erroneously designated as subdivision "1" under subdivision (k) of section 72-106 Wyoming Compiled Statutes 1945, pp. 844-6 Vol. 4) as follows:

"The words 'injuries sustained in extra-hazardous employment', as used in this chapter (article), shall include  death resulting from injury, and injuries to employees, as a result of their employment and while at work in or about the premises occupied, used or controlled by the employer, and injuries occurring elsewhere while at work in places where their employer's business requires their presence and subjects them to extra-hazardous duties incident to the business, *but shall not include injuries of the employe occuring while on his way to assume the duties of his employment or after leaving such duties, the proximate cause of which injury is not the employer's negligence;*" (Italics supplied).

The italicized language of the statute quoted above merely put in statutory form what the courts had theretofore ruled and still rule almost universally upon the point, i. e., that the mere fact that the employee is "going to or coming from" the duties of his employment, *nothing else appearing,* does not entitle him to be regarded as coming within the terms of the Workmen's Compensation Act when he suffers injuries during "going or coming". But when other circumstances are injected such as where the employer himself as a part of the employment arrangement supplies transportation to and from the place where the duties of the

employee actually commence, an exception to the general rule arises and a different result ensues.

As pointed out in Cueller vs. American Employers' Insurance Co. of Boston, Mass. 36 New Mexico 141, 9 Pac. 2d 685, the State of New Mexico has a statute almost identical in language with our subdivision "I" supra. And concerning it the Supreme Court of that state said:

"As a general rule, no compensation is recoverable by an employee who is on his way to or from work, but there are exceptions to the rule. Among the exceptions recognized are where, in going to and from work, the means of transportation is provided by the employer, or the time consumed is paid for or is included in the wages;"

And in Sedlock vs. Carr Coal Mining and Mfg. Co., 98 Kan. 680, 159 Pac. 9, the Supreme Court of Kansas considering a statute reading:

"The words 'arising out of and in the course of employment' as used in this act, shall not be construed to include injuries to the employee occurring while he is on his way to assume the duties of his employment or after leaving such duties, the proximate cause of which injury is not the employer's negligence." Laws 1913, c. 216, § 4.

remarked that:

"The statutory definition of the words, 'arising out of and in the course of employment,' is substantially the meaning applied to them by the courts which have had them under consideration."

In applying subdivision "(1)" supra to the facts as they appear in the record before us and as recited above, we are bound to keep in mind several fundamental principles which this court has heretofore invoked in construing the provisions of the Workmen's Compensation Act of this state. First, the law in question is to be reasonably and liberally construed to pro-

tect persons suffering injuries in stated types of industry. Fuhs vs. Swenson, 58 Wyoming 293, 131 Pac. 2d 333, and cases therein cited. Secondly, a construction should be adopted that "where reasonably possible that industry and not the individual workman should to a large extent bear the burdens of accidents suffered therein". Christensen, State Treasurer, vs. Sikora, 57 Wyoming 57, 112 Pac. 2d 557. These principles do not call for fanciful or strained interpretations of the law but those only which are based upon reason and authority and thereby the primary purpose of the act to supply an accident insurance system may be furthered, that purpose being so clearly indicated in the early case of Zancanelli vs. Central Coal and Coke Co., 25 Wyo. 511, 173 Pac. 981.

Mentioning some half dozen exceptions to the generally accepted rule of "going and coming" referred to above, Horovitz on Workmen's Compensation (1944) p. 162 says that:

"The narrow rule that a worker is not in the course of his employment until he crosses the employment threshold is itself subject to many *exceptions*. Off-premise injuries *to or from work*, in both liberal and narrow states, are compensable (1) if the employee is on the way to or from work in a vehicle owned or supplied by the employer, whether in a public (e. g., the employer's street car) or private conveyance;"

This author also suggests that in addition to the six exceptions noted by him in the text, "Other exceptions undoubtedly are equally justified, dependent on their own peculiar circumstances".

The writer of the elaborate note in 145 A. L. R. 1033 entitled "Workmen's compensation: Injury while riding to or from work in employer's conveyance as arising out of or in course of employment," supplementing earlier discussions on the same point in this series of selected cases states that:

"The general rule is announced in the earlier annotations that where transportation is furnished by an employer as an incident of or under the contract of employment an injury to or death of an employee which results while he is riding to or from work in a conveyance so furnished by the employer arises out of and in the course of the employment, within the meaning of the workmen's compensation acts. This rule is sustained by or applied in the following later cases:"

Decisions from some 24 state jurisdictions are then cited as supporting the view thus expressed. Also in the course of an earlier note in 97 A. L. R. 555, 556, this was said:

"And where an employee was injured while being transported to or from work by a fellow employee, and it was contemplated that the employer should furnish, or be responsible for, transportation, it has been held that the injury arose out of and in the course of the employment."

A number of cases from sundry jurisdictions are then listed as announcing the stated rule.

Passing to concrete examples where decisions have been based upon facts which bear pertinently upon the circumstances disclosed by the record at bar, it is proper at the outset to note our case of Standard Oil Co. vs. Smith, 56 Wyoming 537, 111 Pac. 2d 132. There an employee who operated a bulk gasoline station at Greybull, Wyoming on a commission basis was returning from a vacation. He picked up several barrels of oil delivered to him by his employer at Casper, Wyoming, about 205 miles distant and the only reason he took them was that he was returning home and could take them for business purposes without additional expense. During this homeward journey he was fatally injured in an automobile accident and we held that the death was compensable under the Workmen's Compensation Act though the hauling of the oil was not such as would have justified a special trip. It was pointed out in the

course of the opinion in that case that "an act may be within the scope of employment although done in part to serve the purposes of the workman", i. e., the return to his home from his vacation.

In Hunter vs. Summerville, 205 Ark. 463, 169 S. W. 2d 579, a comparatively recent decision, it appeared that the claimant for Workmen's Compensation under the law of that state lived about 15 miles from his work and his employer impliedly undertook to furnish transportation for this man. It was a prerequisite to claimant's engaging in work for the employer that he be so transported as the employee himself had no means of carriage to and from his work the required distance. The employer tacitly acquiesced in his workman's custom to ride in a subcontractor's truck back and forth from the employment duties when it was convenient to do so and this employee habitually availed himself of this means of going and coming from the work. He was injured in a collision which occurred while riding homeward in this subcontractor's truck which was wrecked in the accident. The only question required to be decided in the case was whether or not the claimant's injury arose out of and in the course of his employment so as to entitle him to the benefits of the Workmen's Compensation Law of the state.

After a comprehensive survey of the law on the point the court's conclusion was stated thus:

"In view of the fact that the evidence in this case established that transportation to and from his work was a prerequisite to the appellee's engaging in the timber cutting, and that there was an implied undertaking by the employer to furnish this transportation, as well as a tacit acquiescence on the part of the employer in the custom of his workmen riding on his subcontractor's truck when it was convenient to do so, we conclude that the circuit court did not err in sustaining the award

made by the commission in favor of the appellee. The judgment of the lower court is, therefore, affirmed."

An earlier case in New Jersey involving the same point of law is that of Fisher vs. Tidewater Building Co., 114 Atl. 150, 96 N. J. L. 103, where the workman was killed by a train striking him some distance from the place of employment and while he was attempting to board another train called a shuttle-train, on which the employer furnished free transportation from the place of employment to the workman's home. It was held that the accident causing the death was compensable.

Referring to the Maryland case of Harrison vs. Central Construction Co., 135 Md. 170, 108 Atl. 874, 112 Atl. 627, where the employer had supplied the employee with a button evidencing his right to free transportation (in the New Jersey case aforesaid a ticket had been given to the employee by the employer), the New Jersey Supreme Court discussed the point as follows:

"It was said, in that case, in the course of the opinion, and reaffirmed, when the injury occurs before the beginning or after the termination of work, there are two general rules applicable to the question as to whether the injury arose out of and in the course of the employment. The first is that an employee while on his way to work is not in the course of his employment. The second is that, where the workman is employed to work at a certain place, and as a part of his contract of employment there is an agreement that his employer shall furnish him free transportation to or from his work, the period of service continues during the time of transportation, and if an injury occurs during the course of transportation, it is held to have arisen out of and in the course of the employment. This rule has the support of English and American cases. True it is in this case, the injury did not happen while being transported, but while in the act of boarding the train; but this we think is a difference without a legal distinction.

"Abraham Fisher met his death by an accident, which arose out of and in the course of his employment. The pudgment of the Camden court of common pleas should be reversed."

The ruling made in the preceding case was referred to in the much later decision from the same jurisdiction, that of Micieli vs. Erie R. Co., 130 N. J. L. 448, 33 Atl. 2d 586. The employee involved was a porter at a railroad terminal and had been given a free pass by the railroad company. He was injured fatally when he attempted to alight from the employer's train on which he had been riding through the use of this pass. The pass contained a provision that the recipient agreed that it was "gratuitously and furnished no part of consideration for services." The Workman's Compensation Bureau gave the employee's widow an award (14 Atl. 2d 56, 18 N. J. Misc. 466), the award was confirmed by the court of Common Pleas (29 Atl. 2d, 412, 20 N. J. Misc. 494) and upon certiorari that court's action was affirmed by the court of last resort in the state.

The question presented was stated by the court last mentioned to be:

"Broadly stated, the basic question for decision is whether the deceased employee died as the result of an accident arising out of and in the course of his employment. More specifically stated, the question for decision is whether the terms and conditions of the pass given to and accepted by decedent at the time of his employment and used by the decedent when he suffered fatal injuries while on his return from work to his home in one of prosecutor's public passenger trains should have barred, as urged, his widow's claim petition for compensation."

In the course of the opinion finally disposing of the case this was said:

"The general rule of law is that injuries sustained by a workman when going to or returning from his place of

work are not considered as arising out of and in the course of his employment. Rubeo v. Arthur McMullen Co., 117 N. J. L. 574, 578, 579, 189 A. 662; Grady v. Nevins Church Press Co. 120 N. J. L. 351, 355, 199 A. 578; Grotsky v. Charles Grotsky, Inc. 121 N. J. L. 461, 3 A. 2d 149, affirmed 124 N. J. L. 572, 12 A. 2d 856. This rule, however, has it exceptions. Injuries sustained by a workman while he is provided with transportation when going to or coming from his work are considered as arising out of and in the course of his employment when such transportation, for example, is the result of an 'express agreement' between the employer and his workman, or when it has ripened into a 'custom' to the extent and it is 'incidental to', and 'part of', the 'contract of employment', or when it is with the 'knowledge and acquiescence of the employer,' or when it is the result of a 'continued practice' in the 'course of the employer's business' and which practice is 'beneficial to both employer and employee'." (Citing authorities).

The case of Williams vs. Travelers Ins. Co., 19 So. 2d 586 was a suit brought by a widow for herself and minor child under the Workmen's Compensation Act of the state of Louisiana to recover compensation from the defendant compensation insurer of her late husband's employer, Southern Pine Inspection Bureau, for the death of plaintiff's husband. The District Court rendered judgment for the defendant. Reversing this action, the Appellate Court used this language concerning the point in which we are here interested:

"There is a second defense based on the grounds that the decedent was not killed while acting in the course and scope of his employment but there is a stipulation in the record to the effect that he was fatally injured in an automobile accident while returning to his residence after having performed his day's work on the job on which he was engaged approximately 30 miles away. He used his own automobile but it is admitted that he was allowed traveling expenses and this, in our opinion, brought him within the rule that an employee who is injured or killed on his way to or from work, where transportation is a concomitant of the contract of hir-

ing, is considered as having been injured or killed within the course of his employment and a claim arising under such circumstances is compensable."

A rehearing was denied in the case and a writ of error to the Supreme Court of the state was refused.

In Johnson vs. Wiese et al. 125 Conn. 238, 5 Atl. 2d 19 there was also the question raised whether or no the plaintiff's injuries arose out of and in the course of her employment. The salient facts were: The defendants who conducted an inn in Woodbury, Conn. on June 1, 1937 entered into a contract with the plaintiff whose home was in New York City whereby she agreed to work for them as cook in their hotel commencing June 4. It was agreed that plaintiff should go by train from New York to Waterbury where she would be transported by the defendants to Woodbury, she to be reimbursed by the defendants for her railroad fare and the transportation from Waterbury to Woodbury to be at their expense. This plan was carried out and she was injured while being transported from Waterbury to her destination. Affirming plaintiff's judgment below this was said:

"One of the recognized exceptions to the general rule that employees are not to be regarded as in the course of their employment while going to or returning from the place of their employment is 'where the employer contracts to and does furnish transportation to and from work.' Whitney v. Hazard Lead Work, 105 Conn. 512, 518, 136 A. 105; Flanagan v. Webster & Webster, 107 Conn. 502, 504, 142 A. 201. Although actual work only commences at the place where, by the contract, it is to be performed, when transportation to that place is provided by the employer, under express or implied agreement, the employment includes the period of transportation, for that is, by the terms of the employment, made incidental to it. Flanagan v. Webster & Webster, supra, page 505, 142 A. page 201. Employment may exist before actual work begins or continue after actual work has ceased."

Where as part of the contract of employment a truck driver was furnished free week-end transportation by the employer to and from home when the last trip of the week left the driver in Chicago, his home being in Grand Rapids, Michigan, it was held in the case of Chrysler vs. Blue Arrow Transport Lines, 295 Mich. 606, 295 N. W. 331, that his death while returning in another of employer's trucks, after spending a Sunday at home, to Chicago where his truck had been left the preceding Saturday was compensable as "arising out of and in the course of employment". That point was discussed in this language:

"Defendant urges application of the rule that travel to and from the place where the employee's duties are to be performed is unrelated to the employment. See Furino v. City of Lansing, 293 Mich. 211, 291 N. W. 637; Simpson v. Lee & Cady, 294 Mich. 460, 293 N. W. 718. But in Konopka v. Jackson County Road Comm., 270 Mich. 174, 258 N. W. 429, 431, 97 A. L. R. 552, it was said that where the contract of employment contemplates conveyance of the employee to or from his place of work, accident arising out of such transportation is compensable. Solution of the problem in the present case is aided by the test suggested in the Konopka case, 'whether under the contract of employment, construed in the light of all the attendant circumstances, there is either an express or implied undertaking by the employer to provide the transportation.'
"In the case before us there was a clear undertaking on the part of the employer to furnish week-end transportation between Grand Rapids and Chicago whenever the last trip of the week did not leave the driver in his home town."

In Vaughn vs. Standard Surety & Casualty Co., 27 Tenn. App. 671, 184 S. W. 2d 556, Vaughn was working by the hour being paid thirty cents per hour but was not paid for the time it took to transport him to and from his work. His time began when he reached the job and started to work and ended when he quit work at the job. He worked at places ranging from five to

sixty miles from the employer's place of business at McMinnville. When the day's work was finished he was transported on employer's trucks from the place where he quit work back to McMinnville if he so desired. There was no specific requirement that Vaughn had to come back to the employer's office at McMinnville after he had finished his day's work. He could go directly from the job where he quit work to his home if he so desired. He was, however, required to report at the McMinnville office of his employer each morning before going to work. The day he was hurt, Vaughn quit work about 4:00 P. M., got into a truck owned by the employer, Smith, but driven by a fellow employee, and started to McMinnville. During this trip the truck became involved in an accident and Vaughn was injured. The trial court held that Vaughn was not an employee of Smith when the accident happened; that his injuries were not received in the course of his employment; that the contract of employment did not provide for transportation and that Vaughn was riding in the employer's truck as an invitee for his own convenience and not as a matter of right or contract; that the carriage of Vaughn was not an incident to his employment and it could not be implied from the contract that transportation was to be supplied by Smith to Vaughn to and from his work.

With these conclusions the Appellate Court disagreed, reversed the judgment, and said, after reviewing the facts in the case:

"Under these facts and circumstances, we cannot escape the conclusion that the transportation of Beecher Vaughn to and from his work was a necessary incident to his contract of employment. It is not reasonable to suppose that any laborers could be employed for thirty cents an hour who had to furnish their own transportation over a distance ranging from ten miles to one hundred twenty miles, each day, going to and from their work. While no express contract for transportation

was made with complainant, there was testimony that he knew and expected that he would be transported by his employer in these trucks from McMinnville in the morning to the job where he would work and from the job in the afternoon back to McMinnville. It is not reasonable to suppose that the contracting parties would contemplate that these men would be carried in trucks a distance of fifty or sixty miles from McMinnville and not returned after the day's work was done. It is true that complainant did not have to avail himself of this means of transportation, but as an actual fact he did avail himself of it.

"We, therefore, hold that transportation was incidental to the employment contract and a part thereof; and that Beecher Vaughn was an employee of W. A. Smith at the time he was injured, riding in a truck which was operated by Hilton Browning, another employee of W. A. Smith, on business for W. A. Smith—transporting complainant and the other laborers who had worked on the job that day back to McMinnville according to the usual custom and practice."

The question in Employers Reinsurance Corp. vs. Jones, 195 S. W. 2d 810 was whether an employee received his injury in the course of his employment with the Frost Lumber Industries, Inc. which was insured by the defendant in this case pursuant to the Workmen's Compensation Law of the State of Texas. An award against the insurer was affirmed in the trial court and the insurer appealed. The facts involved appear from the following statement of the court:

"From the evidence it appears that the appellee Jones went to work for Frost Lumber Industries, Inc., in August, 1942, as a log cutter in the woods; that he went back and forth to the woods on a log truck in the morning and back from work in the evening on a log truck; he was hired as an extra log cutter and on some days would work and on some others he would not; depending on his employe's need for his services; that in most instances he did not know whether he was to work or not until he went out to the woods front; that on the morning of September 4, 1942, the day when he was

injured, he went out to the woods front to work if his foreman needed him, riding out on one of the log trucks customarily ridden by him; on arriving there he learned that he would not work that day; he then set out to find a log truck going back into town and secured a ride on a truck owned by one Richards, driven by another person, Sammie Richardson; the appellee undertook to help Richardson finish loading logs upon his truck in order to ride with him back to town and while doing so a log fell on his leg and broke his ankle; that Richards was using his truck to haul logs for Frost Lumber Industries, Inc., and that under his agreement with that concern he was to transport Frost Lumber Industries' woods employees to and from the woods."

Affirming the judgment below, the opinion states:

"The authorities seem to be in agreement that where transportation is a part of the contract of employment and the employee sustains accidental injury while being so transported by the employer or by means afforded by the employer for such transportation, the employee will be regarded as within the course of his employment and such injuries are compensable within the terms of the Workmen's Compensation Statute, Vernon's Ann. Civ. St. art. 8306 et seq. Republic Underwriters v. Warf, Tex. Civ. App., 103 S. W. 2d 871; Federal Surety Co. v. Ragle, Tex. Com. App., 40 S. W. 2d 63. On the authority of these cases, and cases cited therein, we believe that no error is presented by the appellant by its first three points."

It is interesting to note that in Minnesota the provisions of the Workmen's Compensation Law (Minn. St. 1941, Section 176.01 subdivision 11) read originally:

"Without otherwise affecting either the meaning or interpretation of the abridged clause 'personal injuries arising out of and in the course of employment', it is hereby declared:

"Not to cover workmen except while engaged in, on, or about the premises where their services are being performed, or where their services require their presence as a part of such service, at the time of the injury, and during the hours of service as such workmen;"

Under the law as it then stood it was decided in Nesbitt vs. Twin City Forge & Foundry Co., 145 Minn. 286, 177 N. W. 131 that a claimant could not succeed where he was going to and from his work and during either trip was injured, as the liability of the employer was not intended to cover workmen injured "except while engaged in, on, or about the premises of the employer". Thereafter, the state legislature by Minn. Laws 1923 Chapter 300, Section 14, added to the statute thus worded the following amendatory language:

*"provided, that where the employer regularly furnishes transportation to his employees to or from the place of employment, such employees shall be held to be subject to this chapter while being so transported."* (Italics supplied.)

With the statute in this final form, the case of Radermacher vs. St. Paul City Ry. Co., 214 Minn. 427, 8 N. W. 2d 466, was decided. It was there held that where a street car company issued free tickets to an employee to transport him to and from his work and he was standing on a "safety zone" waiting to board an approaching street car and was there injured by a passing motorist, the injured workman was protected by the amendment to the law above recited; that where as an incident to the employment, it was contemplated and understood by both employer and employee that the former would transport the latter to or from the place where the work was being done, an accidental injury to the employee while thus being transported arose out of and in the course of the employment; that there need be no formal contract between employer and employee that transportation would be furnished; that it was enough that the employer regularly provided it and the employee used it; that it was immaterial whether the carriage was by public or private conveyance as in either event the transportation was an incident of the employment.

The case most closely analogous in its facts to the situation presented by the record at bar which has come to our notice is that of Trussless Roof Co., v. State Industrial Accident Commission, 119 Calif. App. 91, 6 Pac. 2d 254. That proceeding was one where the State Industrial Accident Commission of California had made five awards to as many injured employees of the Trussless Roof Company. The employer and the Pacific Employers' Insurance Co., the insurer of the employer, sought certiorari to have these awards annulled. The awards were made in consequence of a collision between an interurban car and the passenger automobile carrying these five homeward bound employees of the roof company, resulting in injuries to all five.| The question presented was whether these injuries were compensable under the Workmen's Compensation Law of California and under the facts submitted to the Commission.

The Appellate Court after stating that:

"it is now established that injuries received by an employee, while making use of transportation furnished by and under the control of his employer, as such, are compensable under the Workmen's Compensation Act, though the employee at the time was not at work, but was going to or from the place of employment."

and that:

"The commission was warranted by the evidence in concluding that a term of the contracts of employment between petitioner Trussless Roof Company and the five injured men was that on a job beyond the ten-cent fare limit transportation would be furnished. In a few instances it had been furnished by the use of company trucks."

reviewed the material facts and applicable principles of law in the case thus:

"The recognized practice, however, was for one or more of the men to take others, he who furnished the con-

veyance to be reimbursed on one of two bases, at the option of the employer; either six cents a mile for the distance driven, or a sum equal to what would have been the round-trip fares of those taken, had the trolley lines been used. No man paid fare to any one, nor was any one paid anything by the company with respect to transportation except those who furnished conveyances, and that as indicated. The particular automobile to be used was decided upon from day to day by the men themselves, the employer not knowing in advance, unless incidentally, who was to take whom. Once a week a report was made as to the amount of transportation each one had furnished, and the subsequent pay check was increased by the amount allowed for furnishing transportation. The looseness of the arrangements thus appearing is made the basis of an argument by the petitioner: First, that there was no agreement to furnish transportation; but more earnestly, that in the instant case the transportation was not under the control of the employer. Neither conclusion follows. Two agreements, it seems to us, were entered into with each employee: (a) You shall have your transportation free; (b) I shall pay you, if you take a fellow employee. That the men decided among themselves which promise they would rely upon each day does not destroy the binding effect of the promises. The one who drives becomes, that day, the agent of the employer in furnishing the promised transportation. And as such he meets the requirement that the vehicle be within the control of the employer."

The court further said:

"In any event, we think it cannot be said that the employer, to be liable, must himself own the vehicle used, nor need he himself drive it."

The opinion in the case concluded:

"We are satisfied that the petitioner Trussless Roof Company was shown to have furnished, as employer, the vehicle in which four of the five injured men were riding home from their work, and that it had employed the fifth man to drive the other four home. Consequently, the five awards are affirmed."

A petition for rehearing of the foregoing cause was thereafter denied by the appellate court and an application by the petitioners to have the cause heard in the Supreme Court of California after the rendition of the judgment in the District Court of Appeal was also thereafter denied.

When we keep in mind that the oil well where the claimant and the rest of the drilling crew worked was at a place where no arrangements for their accommodation had been made and approximately fifty miles from the place where they resided; that carriage by automobile was the only practical means of getting to and from the work at the well site; that the employer paid that member of the crew—in this instance, the driller, Long, who hired claimant and his fellow crew members—who used his car to transport the remaining members of the crew to and from their homes; that both the company and these employees contemplated that free carriage to and from their homes was to be furnished them; that the consideration for the employer's agreement to furnish this transportation was, in part at least, based on the performance of work for the company by the claimant at the oil well for "they didn't receive transportation unless they worked tower"; that under the unusual war condition which prevailed in this state at that time, the arrangement and practice adopted was for the mutual advantage of both the employer and employees; and finally that whoever drove the car for which service he was paid by the company on a mileage basis as before stated, became as a matter of fact that day, the agent of the employer in furnishing the promised transportation, thereby establishing the vehicle in some measure within the control of the employer, we are constrained to conclude that the company supplied claimant with free transportation to and from his home as an incident of the contract of employ-

ment. As we have seen, the treasurer of the company admitted that "these men really got their transportation in addition to their wages". In consequence of this arrangement and the detailed facts above set forth, we also conclude that under the great weight of authority as we find it, the injuries suffered by claimant through the accident in question should be regarded as compensable under the Workmen's Compensation Act of this state. We are not unmindful that a few courts have taken a strict and as we think too narrow a view of the phrase "in the course of employment" but having regard to the purpose of the law and the liberal construction thereof which we have consistently followed for many years and which the legislature of the state has never disapproved, we are not inclined to adopt such a view at this late date.

There is another phase of this matter that should not be overlooked. In Cudahy Packing Co. vs. Parramore, 263 U. S. 418, 44 S. Ct. 153, 68 L. Ed. 366, Mr. Justice Sutherland speaking for the Supreme Court of the nation declared:

"Whether a given accident is so related or incident to the business must depend upon its own particular circumstances. No exact formula can be laid down which will automatically solve every case. The fact that the accident happens upon a public road or at a railroad crossing and that the danger is one to which the general public is likewise exposed is not conclusive against the existence of such causal relationship, if the danger be one to which the employee, by reason of and in connection with his employment, is subjected peculiarly or to an abnormal degree."

This drilling crew had been engaged in laying or setting drilling pipe for sixteen consecutive hours—two full ordinary shifts; they had worked hard and were extremely tired; all four of the employees went to sleep shortly after entering the automobile for the home-

ward trip; indeed, they were all sound asleep at the very moment the accident happened; the car, driven by the driller who had charge of the work of the crew at the well, apparently functioned properly for some thirty-five miles of travel mostly on a smooth hard-surfaced road way and then for some reason—no one knows why, and the driver who doubtless might be able to tell is dead—left the road at high speed and the accident and injuries ensued. There is grave doubt in our mind that these men including the driver were, in view of their physical condition, in shape to proceed safely on the open highway in a high speed conveyance; their condition in being so tired and worn from work and loss of sleep is directly traceable to their employment at the well site. Their employer knew or should have known of their condition and made due provision to meet it. Is it not a reasonable inference that under such circumstances they were subjected to abnormal dangers which if they had worked only the one shift they would not have ordinarily experienced? We are inclined to think so.

We may not better close our discussion of the record now before us than by directing attention to the decision rendered in Cardillo, Deputy Commissioner, United States Employees' Compensation Commission vs. Liberty Mutual Insurance Co. et al, —— U. S. ——, 67 S. Ct. 801, L. E. ——, the most recently decided (March 10, 1947) case of material aid in properly resolving the vital question in the matter at bar which has come under our notice.

There an award made by Cardillo as Deputy Commissioner under the District of Columbia Workmen's Compensation Act was involved. That law defined the term "injury" to include "accidental injury or death arising out of and in the course of employment". Just here we may recall that the language "while at work"

appearing in subdivision "(1)" of section 124-106-7 W. R. S. 1931 hereinbefore quoted has been decided to be synonymous in meaning with the phrase "in the course of his employment." It was so held, and it would seem correctly, by the Supreme Court of New Mexico in McKinney vs. Dorlac, 48 N. M. 149, 146 Pac. 2d 867 construing the statute of that state which as before noted so closely resembles our subdivision "(1)" aforesaid.

The facts upon which the Deputy Commissioner made his award were succinctly these: One Ticer and his wife were District of Columbia residents and he had been employed for some years as an electrician by E. C. Ernst Inc., a contractor doing electrical work in the District and adjacent territory. In November, 1940, his employer transferred him from work in the District to a project at the Quantico Marine Base in the State of Virginia. He was there employed for more than three years until the time of his injury in December, 1943. During that employment there was in effect an agreement between the electrical workers union and the Ernst Company providing that transportation should be furnished by the latter for all work outside the District. The sum of $2.00 per day was fixed in that agreement as transportation expense and represented the approximate cost of travel from the District to the Marine Base aforesaid and return. This amount was paid Ticer and others in addition to the regular hourly pay rate and was in lieu of the employer's furnishing transportation. In the matter at bar it will be remembered that the employer under authority of the War Labor Board paid just one man to furnish the transportation for the drilling crew, i. e., the man who used his own car to transport the rest of the drilling crew, but each man, nevertheless, got his transportation in addition to his wages, as already observed.

The Marine Base job being several miles from the Quantico bus or train terminal, it became necessary for Ticer and his co-workers to drive their own automobiles to and from work. These employees formed a car pool which was operated thus: Each morning, driving from their respective homes in their own cars, they met at a designated place in Virginia. Thence they proceeded in one car to the job at the Marine Base, reversing this procedure in the evening. The employees alternated in the use of the cars between the meeting place and the work at the Marine Base. Employees not members of the car pool each paid the car owner one dollar for the round trip. The Ernst Company knew of the means of transportation these men used and acquiesced therein. December 13, 1943, Ticer was driving his own car on a direct route from the job site to his home, the work for the day being ended. Four co-employees were riding with him, two of them not being members of the car pool. As Ticer's automobile passed a truck on the route home aforesaid, a large stone thrown by the truck's rear wheel crashed through the car's windshield striking Ticer's head, crushing his skull and causing such injuries that he died four days later.

The claim of Ticer's widow for compensation was upheld by the Deputy Commissioner against the contention made by the Ernst Company and its insurance carrier that Ticer's injury did not arise out of or in the course of his employment. It was also asserted in opposition to the award that the Deputy Commissioner was without jurisdiction to act in the matter. Thereafter the employer and its insurer brought an action in the district court to set aside the award thus made. This that court declined to do but entered judgment dismissing the action. Upon appeal, the court of appeals for the District of Columbia reversed the judg-

ment below holding that Ticer upon the close of the day's work at the Marine Base was "Free of his employer's control" and that he had thereafter assumed his own risk in subjecting himself to the hazards of the highway. This ruling of the appellate court was brought by certiorari before the Supreme Court of the United States.

After determining the jurisdictional question adversely to the employer and its insurer the court passed to a consideration of the remaining contention advanced by them. Referring to the general rule that compensation is precluded as regards injuries suffered by employees while traveling between their homes and their regular places of work, the court of ultimate authority noted that the appellate court had itself recognized at least four exceptions to the rule, the second of which was "Where the employer contracts to and does furnish transportation to and from work" and that the Deputy Commissioner had decided that this exception was applicable under the facts and law involved, the employer having agreed to furnish transportation to and from work and had paid the expense thereof in lieu of actually supplying the transportation.

Citing the case of Cudahy Packing Co. vs. Parramore supra, the court said:

"Each employment relationship must be perused to discover whether the employer, by express agreement or by a course of dealing, contracted to and did furnish this type of transportation. For that reason it was error for the Court of Appeals in this case to emphasize that the employer must have control over the acts and movements of the employee during the transportation before it can be said that an injury arose out of and in the course of employment. The presence or absence of control is certainly a factor to be considered. But it is not decisive. An employer may in fact furnish transportation for his employees without actually controlling

them during the course of the journey or at the time and place where the injury occurs. Ward v. Cardillo, supra. (135 Fed. 2d 260, 262). And in situations where the journey is in other respects incidental to the employment, the absence of control by the employer has not been held to preclude a finding that an injury arose out of and in the course of employment. See Cudahy Packing Co. v. Parramore, supra; Voehl v. Indemnity Ins. Co., supra. (288 U. S. 162, 53 S. Ct. 380, 77 L. Ed. 676).

"Indeed, to import all the common law concepts of control and to erect them as the sole or prime guide for the Deputy Commissioner in cases of this nature would be to encumber his duties with all the technicalities and unrealities which have marked the use of those concepts in other fields. See Labor Board v. Hearst Publications, supra, 120-121, 125; Hust v. Moore-McCormack Lines, 328 U. S. 707, 723-725. That we refuse to do."

Relative to the matter of Ticer's not receiving wages at the time of the injury, it was ruled that:

"The fact that Ticer was not being paid wages at the time of the accident is clearly immaterial. Cudahy Packing Co. v. Parramore, supra. And it is without statutory consequence that the employer here carried out his contract obligation to furnish actual transportation by paying the travel costs and allowing the employees like Ticer to make the journey by whatever means they saw fit."

Pointing out that the Ernst Company paid travel costs as a means of carrying out its obligation to furnish the transportation itself, this also was said:

"Where there is that obligation, it becomes irrelevant in this setting whether the employer performs the obligation by supplying its own vehicle, hiring the vehicle of an independent contractor, making arrangements with a common carrier, reimbursing employees for the use of their own vehicles, or reimbursing employees for the costs of transportation by any means they desire to use. In other words, where the employer has promised

to provide transportation to and from work, the compensability of the injury is in no way dependent upon the method of travel which is employed. From the statutory standpoint, the employer is free to carry out its transportation obligation in any way the parties desire; and the rights of the employees to compensation are unaffected by the choice made."

Referring to the circumstances under which the obligation of the Ernst Company to supply transportation arose, the court used the following significant language:

"there was also evidence that the distant location of the Marine Base project, the hours of work and the inadequacy of public transportation facilities all combined to make it essential, as a practical matter, that the employer furnish transportation in some manner if employees were to be obtained for the job. This was not a case of employees traveling in the same city between home and work. Extended cross-country transportation was necessary. And it was transportation of a type that an employer might fairly be expected to furnish. Such evidence illustrates the setting in which the contract was drawn."

Concluding that the award of compensation should be sustained, the ruling of the court of appeals was reversed.

Under the peculiar circumstances of the case at bar, the applicable law as we conceive it to be from a careful examination of the authorities, we are obliged to direct that the judgment of the District Court of Hot Springs County should be reversed and the cause remanded for further proceedings not inconsistent with the views hereinbefore expressed.

*Reversed.*

KIMBALL, J., and BLUME, J., concur.