**WHITE DITCHING COMPANY, Appellant**
**(Employer-Defendant Below),**

v.

**Lloyd G. GIDDEON, Appellee (Employee-**
**Plaintiff Below).**

**WHITE DITCHING COMPANY, Appellant**
**(Employer-Defendant Below),**

v.

**Luke MOYER, Appellee (Employee-**
**Plaintiff Below).**

**Nos. 3499, 3518.**

Supreme Court of Wyoming.

April 12, 1966.

William T. Schwartz and D. Thomas Kidd, Casper, for appellant.

Robert Jerry Hand, Casper, for appellees.

William D. Norman, Sp. Asst. Atty. Gen., amicus curiae for Wyoming State Treasurer ex rel. Workmen's Compensation Department.

Before PARKER, C. J., and HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Justice HARNSBERGER delivered the opinion of the court.

Moyer and Giddeon, employees of White Ditching Company, were injured in a motor vehicle accident which occurred after they had left the company's "job site" enroute to the city of their residence some 40 miles distant. Both employees sought awards under the Wyoming Workmen's Compensation Act, and the employer objected on the ground that their injuries were not sustained during their employment. The State Treasurer was permitted to intervene as amicus curiae, and the two cases were consolidated for trial to the court which awarded compensation to both Moyer and Giddeon. White Ditching Company, hereinafter referred to as White, has appealed, claiming the trial court erred.

The cases were each submitted upon separate agreed statements of facts plus the testimonies of Moyer on behalf of Giddeon and himself and that of the president in charge of White's operations. A summary of this evidence as it related to Giddeon shows the employment contract between White on the one hand, and Giddeon, as a welder, on the other, was "governed" by Pipeline Contractors Association agreement with Pipeline Local Union #798; that as "steward," a function in behalf of the union, Giddeon was paid fifty cents an hour

extra; that apart from and above his contract of employment Giddeon had leased his truck-mounted welding unit, called a "rig," to White at the rate of $3.20 an hour; that Giddeon was to use this rig in his employment by White, the rental time for the rig to be coincidental with the time Giddeon was paid as White's employee which was daily from 7:00 a. m., until 5:30 p. m.; that Giddeon was to pay the fuel, maintenance, and insurance for his rig and White exercised no supervision or control over the rig; that White paid workmen's compensation charges to the State on the amounts paid Giddeon as a welder but paid the State nothing upon amounts paid Giddeon as rental for his rig; that White did not withhold any federal income taxes from amounts paid for the rig rental; that on October 19, 1964, Giddeon reported for work at White's warehouse in Casper, successfully passed his welding test, and reported with his rig at White's jobsite some 40 miles distant in the afternoon and worked until 5:15 p. m., at which time he started to pick up his equipment preparatory to quitting; that White furnished a 40-passenger bus with driver to transport employees to and from the company headquarters in Casper and the jobsite, and this bus was present on the job at all times during working hours and was in operation on October 19, 1964, transported personnel to its warehouse in Casper following quitting time, and was available to Giddeon; that no instructions were given Giddeon concerning use of the bus; that Giddeon was not compensated by White in any manner for driving his rig to and from the jobsite, and Giddeon did so at his own expense; that White furnished an open area at the jobsite for storage of privately-owned rigs where White left its company-owned welding rigs, tractors, and other light and heavy equipment of much greater value than Giddeon's rig; that Giddeon did not ride the company bus to Casper but drove his rig from the jobsite to a point beyond the fenced area of the jobsite where he left his rig and got into Moyer's rig, instructing Moyer's helper to drive the Giddeon rig and follow the Moyer rig; that White did not know this had taken place and did not concur in such action; that the road from the jobsite was public and not in any manner under White's control; that at a point on the road about 11 miles from Casper and at about 6:00 p. m., the accident which injured Giddeon occurred; that White exercised no supervision or control over the rig of any sort other than to point out the work to be performed on the job; that the job ended at 5:30 p. m., and Giddeon was free to do as he pleased until 7:00 a. m., the next morning when he was to report at the company warehouse in Casper where the company bus and driver were available to drive employee personnel to the jobsite; that time for drawing wages and lease rental for private rigs commenced at 7:00 a. m., at the warehouse in Casper and ended at the jobsite at 5:30 p. m.; and that White knew that rig welders often drove their rigs to and from the job, and White did not instruct them in any way concerning the use of the rigs.

Moyer testified he did not know of the existence of "this particular bus" but that it was customary and "they" ordinarily have a bus; that he did not see the bus or have any discussion or instruction (about the bus); that on a different job and contract where the employer furnished the fuel the employer wanted the rigs left on the job to cut down on fuel consumption as the employer had a night watchman and the rigs were serviced on the jobsite; that the company had a fuel truck out there but it was not available to them as they had to buy their own fuel; that ordinarily rig welders do not ride the bus and usually drive their rigs in; that "there are so many times that they deviate from the customary that a man couldn't make it as a—" (here the witness was interrupted by claimants' counsel); and that he worked in the vicinity where Giddeon worked that day.

The White company president testified that White furnished a 40-passenger bus for transporation of on-the-job employees; that the bus left the warehouse (in Casper) that

morning at approximately 7:00 or 7:30 taking the men out to the job; that the bus was on the jobsite during the day; that there was a fuel truck on the job which was available; that at times welders leave their rigs (on the jobsite) and the company takes care of them, fuels them, changes oil filters, whatever is necessary, and charges same to the welder; that there was no reason, except the welders' convenience, for the welders to drive their rigs back and forth to town or to and from the warehouse after they got the rig to the jobsite; and that he never instructed welders that they should leave their rigs and ride the bus.

From the above recount of the testimonies of Moyer and White's president, it appears that there was no conflict except upon the question of whether fuel was available to appellants at the jobsite. As there was no evidence as to the need of either appellee to obtain fuel at the jobsite, that matter is not important in this appeal.

However, White's president testified positively that bus transportation to and from the jobsite was available to both appellees; that the company took care of welders' rigs when left at the jobsite, and that there was no reason for welders to drive their rigs back and forth to town except for their own convenience.

■ Included in the Pipeliners Local Union No. 798 Pipeline Agreement with Pipeline Contractors Association, which was stipulated as governing the contract of employment between White and its employees Giddeon and Moyer, is the following provision:

"IV WORKING RULES

"(A) Employer shall make suitable and prompt transportation available from the warehouse to the work site and back to the warehouse. The time of men shall start when the men leave the warehouse for the job site and shall end at quitting time on the job site * * *."

Under the agreed facts, the undisputed testimonies of witnesses, and the agreement governing the contract, it is uncontrovertible that the employment of Giddeon by White on the day of the accident ended at the 5:30 p. m., quitting time and on the jobsite. What happened thereafter did not occur during appellees' period of employment or in connection with or while they were engaged in the business of the employer.

Jensen v. Manning & Brown, 63 Wyo. 88, 178 P.2d 897, and other cases cited by appellees in support of their position are inapplicable to the circumstances here as evidenced by agreed statement of facts and testimony. In Jensen the employer paid for the transportation during which the accident occurred. Here the employer did not pay for or authorize the transportation used. In fact, that transportation was used without appellant's knowledge or consent. In addition, under the express terms of the contract of employment as governed by the union agreement, the employees' engagement in the service and business of the employer had terminated before the accident which injured Giddeon and Moyer.

■ Although Moyer testified he did not see the bus on the jobsite which was provided by White for transportation from its warehouse to the jobsite and back again, and no one instructed him about it or discussed it with him, he acknowledged it was customary that there be such transportation. While Moyer's testimony as to his knowledge may not properly be ascribed to Giddeon and his knowledge as to the availability of the bus, both Giddeon and Moyer are charged with knowledge of the provisions of their contract of employment and that it was governed by the union agreement, which required the employer to make available such transportation. This knowledge should at least have put both appellees on notice and inquiry as to the availability of such transportation facility.

■ While the summary of agreed facts set forth herein were those stipulated between White and Giddeon, the agreed facts set forth in the stipulation between White and Moyer were substantially identical.

Section 27-49[III.] (a), W.S.1957, provides as follows:

"[III.] In this act unless the context otherwise requires, the following words, to-wit: Injuries sustained in extra-hazardous employment, and injury and personal injury are defined as follows:

"(a) *Injuries sustained in extra-harzardous* [sic] *employment.*—The words 'injuries sustained in extra-hazardous employment' shall include death resulting from injury, and injuries to employees, as a result of their employment and while at work in or about the premises occupied, used or controlled by the employer, and injuries occurring elsewhere while at work in places where their employer's business requires their presence and subjects them to extra-hazardous duties incident to the business, but shall not include injuries of the employee occurring while on his way to assume the duties of his employment or after leaving such duties, the proximate cause of which injury is not the employer's negligence;."

The wording of this statute makes it plain and positive that the legislature did not intend that injuries sustained by an employee after leaving the duties of employment should be compensated. So we have not only the positive contract including the union agreement which fixes the period of termination of employment at the close of the workday on the jobsite, but, as a matter of statute law, there is a corresponding provision.

We find no merit in appellees' motion to dismiss the appeal for failure of appellant to timely file its record on appeal here, as the same was filed within the time allotted by the Wyoming Rules of Civil Procedure.

Although there is some question as to whether there was timely filing of a claim for award in behalf of Giddeon, under the decision herein reached, it is unnecessary to deal with that point.

The learned trial court was clearly in error in its finding that the unfortunate accident in which Giddeon and Moyer were injured occurred while they were working in a covered occupation under the workmen's compensation laws of the State of Wyoming, and that their injuries were sustained in traveling from their place of employment in the course of their employment by White Ditching Company and in awarding compensation for those injuries.

The awards of compensation to both Giddeon and Moyer are therefore vacated and set aside and the judgment of the lower court is reversed.

Reversed.