Charles Kerry CZAPLA and Elizabeth Ann Czapla, Appellants (Plaintiffs below),

v.

Wayne GRIEVES, d/b/a Grieves Real Estate and Insurance, et al., Appellees (Defendants below).

No. 4561.

Supreme Court of Wyoming.

May 12, 1976.

Wade Brorby, Morgan & Brorby, Gillette, for appellants, on brief.

Edward S. Halsey, Newcastle, for appellees, on brief.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

The plaintiffs-appellants brought an action against defendants-appellees for specific performance of a land sales contract or damages for breach of contract if specific performance could not be granted. The district court denied any relief to plaintiffs. It is from that judgment and decree for the defendants that plaintiffs appeal.

The plaintiffs, husband and wife, were looking for pasture land and contacted the defendant Grieves, a real estate broker. Later Grieves called plaintiff-husband ad-

vising he had a listing of what he thought plaintiffs wanted. He showed plaintiffs his listing from the owners, which was made in the following form:

"Listed by Wayne A. Grieves

"UNIFORM SALES AGENCY CONTRACT

"Dated 4/26  19 74

"In consideration of your agreement to use your efforts to find a purchaser for the property described herein, I hereby grant to you the exclusive right and privilege for the term of 6 months from date hereof to make sale of the property described as [land described] for the sum of $19,000.00 payable in cash (or with my consent for a lesser sum or on other terms) which price includes all incumbrances, and all taxes of every kind and nature, except as herein mentioned.

"The term 'sale' shall be deemed to include any exchange or trade to which I consent. In the event of an exchange or trade, you are permitted to represent and receive compensation from both parties.

"If, during said period, the property is sold by you or me or anyone else; or if you produce a purchaser ready and willing to purchase the property; or if within six months after the expiration of said period a sale is made to any person to whom the property has been shown by you I agree to pay you a commission of 7% on the ~~first~~ Total Sale Price and ——————% on the remainder.

"~~I represent the title to said property to be good merchantable title and~~ I will execute and deliver a quit claim deed ~~or land contract with full covenants of warranty~~ free of all incumbrances except  none  and furnish abstract and tax history certified down to date of sale.

"You are hereby authorized to place a 'For Sale' sign on said property and to remove all other 'For Sale' signs and to have access to the building or buildings on the property for the purpose of showing the same at reasonable hours. We (I) hereby acknowledge receipt of a copy of this contract.

"  /s/ Lillian M. Dabney

"  /s/ Ernest R. Benhart

"Taxes
129.47  Benhart
52.32  Dabney"

———◆———

The plaintiff signed and delivered to Grieves two standard purchase offer forms because defendant-appellee Dabney owned 320 acres and defendant-appellee Benhart owned 800 acres of the total tract. The total of the two offers was the listed price. Grieves mailed the offers to the owners, both of whom were elderly persons, residing in San Diego. Plaintiffs made a deposit with Grieves on each of the parcels and received receipts noting their purpose.

At the time of signing, Grieves indicated to plaintiffs that "this was as good as sold, that the deal would be final." Plaintiff-husband dropped into defendant Grieves' office shortly thereafter and discovered the price had gone up a thousand dollars because of minerals going with the land. Plaintiffs were agreeable. Grieves again assured him that the deal was final. Mr. Czapla called the broker-defendant several times and was told because the sell-

ers were older people and lived in San Diego, it would take time but reassured him.

Sometime later, it developed that another party, Engle, lessee of the lands, had entered the picture and was dealing directly with Dabney and Benhart. In the scene also appeared an individual by the name of McHorney, a step-grandson of Benhart, also living in San Diego, who was helping the owners as a contact and in an advisory capacity because of their age.

Offers started flying; the plaintiffs got up to $26,000.00. The owners then accepted an offer of $26,500.00 from Engle and plaintiffs finally offered to meet it. Engle did not negotiate through Grieves and Grieves had never gone to him in an attempt to sell the land on behalf of the owners. The plaintiffs insist that because of Grieves' confident representations that the property would be sold to them, they had bought fencing for several hundred dollars; had made other expenditures in time and travel to arrange a joint fencing project with the federal Bureau of Land Management and financing arrangements; had spent $78.33 in phone calls; and had lost interest on the deposits made. Total damages they claimed as a result amounted to around $800.00.

Grieves candidly admitted that since he had an exclusive listing on the property, he did represent to plaintiffs his optimistic views that they would get the property. He denied telling them to go ahead and arrange for fencing with the Bureau of Land Management or financing. Mr. Czapla is a loan officer with the Wyoming Production Credit Association, so hardly needed financing advice. The evidence does not show Grieves ever informed plaintiffs that their offer had been accepted. The owners never did sign an acceptance in the space provided on the standard offer form, nor sign anything other than the exclusive listing with the defendant Grieves.

The issues are: (1) was there a contract in effect by which plaintiffs were entitled to specific performance requiring conveyance by the defendants-owners to them? and (2) are plaintiffs entitled to money damages if specific performance does not lie?

The first question can be answered rather quickly. The applicable part of the statute of frauds, § 16–1, W.S.1957, states that:

"In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith:

"*    *    *    *

"Fifth—Every agreement or contract for the sale of real estate, *    *    *."

No writing was produced by plaintiffs subscribed by the owners of the land or anyone on their behalf, authorized in writing by them. The written listing agreement did not authorize Grieves to accept on their behalf, nor did he sign an acceptance. This issue was settled by *Wallis v. Bosler,* 1952, 70 Wyo. 129, 246 P.2d 771. In *Wallis,* appears a fine analysis of § 16–1. The court concluded that while it may be different in other states, particularly where the statute of frauds contained the phrase "signed by the party to be charged *or by his authorized agent,*" the section, as written and in effect ever since 1871, stating, *"subscribed by the party to be charged therewith",* (emphasis added), means exactly what it says. This court stated:

"*    *    *    As we view it, the statute means that 'the party to be charged' *must sign.* We think that this requirement would be satisfied if the party to be charged were to authorize another in writing to sign. The giving to another parol authority, or an oral ratification, would not be sufficient.

"Such a ruling would place our statute on an equal footing with those statutes which specifically provide that the contract must be signed by the party to be charged or by his authorized agent in writing. We do not believe, as has been

suggested, that such a ruling by this court would interrupt or interfere with the free flow of business transacted under contracts required to be in writing. Powers of attorney under the laws of Wyoming would still be recognized and our holding here would in no way change the law with respect to part performance of a contract by a principal as ground for removing the same from the Statute of Frauds."

We find no reason to make any exception in this case. The offers of the plaintiffs were never accepted by either of the owners in any fashion, in writing. Their agent had no power of attorney or authority in writing from them to in any way create any sort of a binding agreement to sell. There was no part performance. Specific performance is therefore out of the question.

With respect to the second question, we go back to what is now a ritualistic warning to appellants. We must assume that evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it. *Peters Grazing Association v. Legerski,* Wyo.1975, 544 P.2d 449, 455, and references there footnoted. Any statements of fact made in this opinion are made in the light of that rule.

The owners never made any kind of representations to the plaintiffs upon which the plaintiffs had any right to rely. If Grieves had no authority to bind his principals, there is no breach of contract calling for damages. The owners-defendants then cannot on any theory have any liability. Should their broker have any personal liability to the plaintiffs? As alternative relief, plaintiffs seek damages from Grieves, only.

The testimony is in conflict as to whether any actionable representations or misrepresentations were made by the defendant-broker. Plaintiffs contend that he was concealing information from them. The trial judge resolved the conflict against plaintiffs. It was Grieves' testimony that he did not urge plaintiffs to look for financing, did not tell them to go ahead and buy fencing materials, or make any arrangements with the Bureau of Land Management, did not conceal the telephone numbers of the owners, did not keep from them that Engle was making direct offers to the defendants Dabney and Benhart and, most of all, never represented to plaintiffs that their offer had actually been accepted. The most that defendant Grieves did was express an opinion. As disclosed by his telephone record, Mr. Czapla was himself dealing directly by telephone with McHorney, Dabney and Benhart, between July 13 and October 29, 1974; sixteen such calls were made in that period. We can infer that during that time span, the plaintiffs were bidding against Engle and otherwise urging that the land be sold to them.

■ The burden of establishing the extent of an agency rests upon the one who asserts it. *Murphy v. Smith Trailer Sales, Inc.,* Wyo.1976, 544 P.2d 1006, 1010. The only authority that the broker here had was encompassed in the uniform sales agency contract, which he showed to the plaintiffs. They were as informed as the defendant Grieves and knew he was only an agent with that exclusive listing. They showed no other authority from the owners, in writing, authorizing their real estate broker to bind them in writing, let alone bind them orally. The listing agreement itself should have alerted plaintiffs to the risk of possible direct dealing with the owners by another when it said, "If, during said period, the property is sold by you or me or anyone else;" the owners are still liable for payment of the prescribed realtor's commission. It was aptly said in *Trails Motors, Inc. v. First National Bank of Laramie,* 1956, 76 Wyo. 152, 175, 301 P.2d 775, 784, in citing from other authority, that a person dealing with a known agent is not authorized under any circum-

stances to trust the agent's statement as to the extent of his powers and must not act negligently but such person must use reasonable diligence to ascertain the scope of the agent's powers.

The parties to a land contract are presumed to know the law. *Cooley v. Frank*, 1951, 68 Wyo. 436, 451, 235 P.2d 446, 451. That case referred to a weed control tax statute. The plaintiff is presumed to know about the statute of frauds. See 31A C.J.S. (Evidence) § 132(1), p. 245; 29 Am.Jur.2d (Evidence), § 222, p. 272.

The parties to a contract are presumed to know its terms. *White Ditching Company v. Giddeon*, Wyo.1966, 413 P.2d 45, 47. See 29 Am.Jur.2d (Evidence), § 221, p. 271. Plaintiffs knew or should have known by the very terms of their written offers, they would not grow into mutual contracts until signed by the owners. The forms contained clear, separately set out provisions therefor, with blank lines for the sellers' signatures. Plaintiffs knew or should have known that Grieves had no authority to bind the owners and there could be no enforceable contract until Dabney and Benhart signed acceptances of plaintiffs' offers.

We are inclined to the conclusion that the plaintiffs merely acted impulsively and prematurely in any expenditures they made. The plaintiffs just simply failed to establish any cause of action in tort or in contract against the broker, capable of identification.

Affirmed.