Philip H. LAVOIE and Marilyn Lavoie, husband and wife, d/b/a Daisy Laundry, Appellants (Plaintiffs),

v.

SAFECARE HEALTH SERVICE, INC., a Washington Corporation, d/b/a Lander Valley Regional Medical Center, Appellee (Defendant).

No. 90–140.

Supreme Court of Wyoming.

Oct. 2, 1992.

Glenn E. Smith of Glenn E. Smith & Associates, Cheyenne, and John R. Vincent of Vincent & Vincent, Riverton, for appellants.

\* Chief Justice at time of oral argument.

William M. McKellar and Peter K. Michael of Lathrop, Rutledge & Michael, P.C., Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT,\* and GOLDEN, JJ.

GOLDEN, Justice.

Mr. and Mrs. Philip H. Lavoie d/b/a Daisy Laundry (Lavoies) sued Safecare Health Services, Inc. d/b/a Lander Valley Regional Medical Center and Pine Ridge Hospital (Safecare) for damages for Safecare's alleged breach of an oral contract under which Lavoies would clean Safecare's laundry for three years. In their complaint, Lavoies asserted claims of breach of contract, promissory estoppel, fraud, and breach of an implied covenant of good faith and fair dealing. The trial court granted summary judgment for Safecare and dismissed the complaint. This appeal presents a classic legal problem of contract formation.

Lavoies raise these issues: [1]

1. Did the district court err in adjudicating material facts in a summary judgment proceeding?

2. Did the district court err in determining there were not genuine issues of material fact in this case?

3. Did the district court err in holding that the appellant's breach of contract claim is barred by the statute of frauds?

4. Did the district court err in holding that the claim for promissory estoppel is barred by the statute of frauds?

5. Did the district court err in granting summary judgment on the Lavoies' fraud claim?

Safecare restates the issues in this way:

I. Whether the statute of frauds bars the Lavoies' claim for breach of contract

II. Whether the theory of promissory estoppel could circumvent the statute of frauds under circumstances established by Mr. Lavoie's own testimony

1. Lavoies have not appealed the issue of breach of an implied covenant of good faith and fair dealing.

III. Whether the Lavoies' fraud claim was barred because they expected a written contract

IV. Whether the Lavoies' fraud claim was barred by their inability to offer any clear and convincing evidence of intent to defraud

V. Whether an independent claim for bad faith can survive the dismissal of the underlying breach of contract claim in a case that does not involve an insurance policy

We affirm.

## STANDARD OF REVIEW IN SUMMARY JUDGMENT

This court's standard of review of summary judgment is:

When a motion for summary judgment is before the supreme court, we have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did he. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.

*Roth v. First Sec. Bank of Rock Springs*, 684 P.2d 93, 95 (1984) (quoting *Reno Livestock Corp. v. Sun Oil Co. (Delaware)*, 638 P.2d 147, 150 (Wyo.1981)).

This court further said:

A summary judgment should only be granted where it is clear that there are no issues of material facts involved and that an inquiry into the facts is unnecessary to clarify the application of law. A material fact is one which has legal significance. It is a fact which would establish a defense. After the movant establishes a prima facie case the burden of proof shifts to the opposing party who must show a genuine issue of material fact, or come forward with competent evidence of specific facts countering the facts presented by the movant. The burden is then on the nonmoving party to show specific facts as opposed to general allegations. The material presented must be admissible evidence at trial. Conclusory statements are not admissible. We give the party defending the motion the benefit of any reasonable doubt. If the evidence is subject to conflicting interpretations or if reasonable minds might differ, summary judgment is improper.

*Roth*, 684 P.2d at 95 (citations omitted).

■ In a summary judgment context, we will not disturb the trial court's judgment if it is sustainable on any theory. *DeWald v. State*, 719 P.2d 643, 650–51 (Wyo.1986).

## FACTS

In keeping with our standard of review, our statement of facts is drawn largely, if not exclusively, from Mr. Lavoie's deposition transcript and his subsequent affidavit, together with the various exhibits identified and discussed in his deposition.

Safecare supported its summary judgment motion with portions of the transcripts of the depositions of Mr. Lavoie and exhibits from his deposition; Mike Ockinga, Safecare's comptroller; and Don Pierson, Safecare's plant manager and head of maintenance. Lavoies countered with the entire transcript of Mr. Lavoie's deposition and exhibits; Mr. Lavoie's affidavit; and affidavits of Mike Kaker and Loretta Rickey, former Safecare employees.

In 1988, Safecare, whose hospitals are in Fremont County, was in the final year of a written three year laundry services contract with Steiner Corporation whose facility was in Casper. In casual conversation between Lavoie and David Elling, an insurance salesman whose client was Safecare, Lavoie approved of Elling's asking Safecare whether it would be interested in having the Lavoies do Safecare's laundry. Elling later called Lavoie, telling him Safecare was interested and to call Ockinga.

In late April, 1988, Lavoie called Ockinga to arrange a meeting. On April 29, 1988, the two met in Ockinga's office. At that meeting Lavoie said he was interested in doing Safecare's laundry and that could remodel his facility to handle the job. Ockinga expressed interest and asked Lavoie to send a written proposal to Dave Brown, administrator of Safecare's Lander Valley Regional Medical Center; Hugh Simcoe, administrator of Safecare's Pine Ridge Hospital; and Ockinga. Lavoie submitted his written proposal by identical cover letters dated May 3, 1988, addressed to Brown and Ockinga. In his cover letter Lavoie said, "We now have the capability to handle all of". Safecare's laundry and drycleaning needs. In the written proposal itself, Lavoie said nothing about remodeling his facility, buying and installing new equipment, and obtaining approval from the state health department. Rather, Lavoie proposed, among other things,[2] that he would meet and comply with all state regulations and would do laundry for twenty-seven cents a pound for three years.

On May 9, 1988, Lavoie met again with Ockinga to discuss Lavoie's written proposal. Ockinga said he was pleased with the proposal. Lavoie said he would meet with his banker to tell him what was going on, meet with his accountant to do the proper paperwork, and meet again with his banker to obtain a loan to remodel his facility, and then apprise Ockinga of the outcome.

Upon leaving Ockinga's office, Lavoie went to see his banker, Charles Krebs. Lavoie told him about his opportunity to do Safecare's laundry and that he would be meeting with his accountant to prepare the necessary documents to apply for a loan.

Next, Lavoie contacted equipment vendors and obtained prices on the equipment he would need in his remodeled facility. He then met with his accountant, Dave Prina, and they worked on a loan proposal which culminated in a loan proposal letter dated May 20, 1988, which they submitted to Lavoie's banker, Krebs.

In Lavoie's May 20 loan proposal letter to Krebs, Lavoie set forth a proposal to expand his existing business. After stating a history of his business, he recited his basic proposal underlying his request for a $30,000 loan:

1. First Wyoming Bank commit to Section I—costs to remodel existing building (refer to Exhibit D) of approximately $3,900.00. Then the owner, Phil Lavoie, will have the State of Wyoming issue a preliminary certification for commercial laundry. This work needs to be completed by June 15, 1988.

2. Owner, Phil Lavoie, then will go to Board of Lander Valley Regional Medial Center to show state certification of facilities and *ask for a signed contract.* The first Wyoming Bank will also need to commit to the balance of the costs of approximately $27,000.00 (Total costs

---

**2.**

Laundry Proposal
1. Contractor agrees to meet or exceed all Wyoming Department of Health Regulations pertaining to Health Care Institutional type laundry. This is to include any further requirements mandated by the JOINT ACCREDITED HOSPITAL REGULATIONS.
2. Liability insurance coverage on all inventory will be for the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00).
3. Pick up and delivery schedules are to be on a daily basis of Monday through Friday. Schedule times are to be mutually determined by the contractor and client. If needs require, week-end pick up and delivery will be accomplished at no extra cost.
4. Turn around time is not to be greater than FORTY EIGHT HOURS (48).
5. All inventory is to be permanently marked and identified by the contractor in a manner prescribed by hospital officials. All normal repairs are to be performed by the contractor without additional cost.
6. All clean inventory is to be returned folded and packaged in sanitary containers as prescribed by hospital officials or as D.O.H. regulations require.
7. All inventory is to be weighed after it has been laundered and dried. This weight is to be the factor used in pricing.
8. The price is to be TWENTY SEVEN CENTS PER POUND ($00.27). All drycleaned items (i.e. drapes etc.) are to be discounted THIRTY PERCENT (30%) from regular retail prices.
9. A performance bond would be be [sic] in place for a period of thirty six months. This is cover up to 252,000 pounds annually.
10. This price is to remain in effect for a period of THIRTY SIX (36) MONTHS from date of contract.

$30,801.57 minus the $3,900.00 in number 1 above.)

3. If contract is obtained and the balance of the project monies are received, then the commercial laundry facilities should be operational by August 15, 1988.

The first monthly payment on the new note at First Wyoming Bank should commence in September, 1988. All other existing debt payments are made timely during the construction phase. (Emphasis added).

Among the several reasons for the bank to make the loan, in addition to the Safecare opportunity, the May 20 letter included the reason that through this expansion Lavoie would be able to acquire additional commercial laundry business from area motels and other hospitals.

On May 20, 1988, Lavoie and his accountant met with Krebs at his office to discuss the loan proposal letter. Krebs told Lavoie he was proceeding in a proper manner. Lavoie said he needed a small amount of the loan money to do the interior remodeling; then, in Lavoie's words, "if we were able to get the certification from the state then I would need the rest of the money in order to put the equipment in place." Krebs said the bank's loan committee would meet on the loan proposal and "probably approve the whole package." Krebs told Lavoie, in Lavoie's words, "You just take whatever you want, the first part first, and let me know when you need the second part * * *."

A day or so after this May 20 meeting, Krebs called Lavoie informing him the whole loan package was approved and loan proceeds would be disbursed upon Lavoie's request. Krebs also told him he [Krebs] would notify Brown and Ockinga by letter that Lavoie had proper financing.

On May 24, 1988, Lavoie met with Ockinga and told him that he had obtained the loan. Ockinga said, in Lavoie's words, "if we got certified by the State Department of Health we would do business."

Lavoie then met with Krebs at the bank and was told, in Lavoie's words, "to go ahead and get started." Lavoie began remodeling his facility. Pierson, Safecare's plant manager and head of maintenance, came by to see the remodeling work.

By letter dated June 8, 1988, addressed to Ockinga, Krebs assured him that Lavoie had made the proper financial arrangements with the bank to fund the remodeling and related costs necessary to receive state certification. Lavoie approved of Krebs' sending that letter since it was very important, before he had a contract with Safecare, to show Safecare that he would be able to handle Safecare's laundry business in a satisfactory manner. Lavoie believed that Krebs' letter enhanced his credibility with the prospective client.

On June 16, 1988, in accordance with arrangements previously made by Lavoie, Francis Reuer, a design engineering consultant with the state health department, inspected Lavoie's facility. At that time Reuer told Lavoie, in Lavoie's words, the facility "[w]as approved as soon as we got [some conditions] done." In Lavoie's words, Reuer "thought all we needed to do was to correct these areas and take care of those things and it wouldn't be a problem." Following Reuer's inspection, Lavoie called Ockinga, told him the result of Reuer's inspection, and arranged to meet with Ockinga the next day.

Lavoie concedes, concerning the above and foregoing activities and events, no contract, oral or written, existed between Safecare and him. Concerning the meeting with Ockinga on June 17, 1988, however, Lavoie contends that in that meeting Safecare and he made the oral contract on which his suit is based. Consequently, we now focus our attention on the facts of that allegedly significant meeting.

In both his deposition, taken on February 27, 1990, and his affidavit, executed on May 11, 1990, Lavoie describes the June 17 meeting. According to his affidavit, Lavoie met Ockinga to inform him that Reuer "had inspected the laundry the day before and things were progressing well; that at this time I explained to Mr. Ockinga I was going to get the remainder of the loan proceeds and purchase the equipment nec-

essary to complete the laundry facility and Mr. Ockinga told me everything looked good and to go for it * * *." On this same subject, Lavoie's deposition testimony was that he told Ockinga that Reuer had approved the laundry facility the day before; he gave Ockinga a copy of Krebs' June 8 letter and explained that he, in Lavoie's words, "had just borrowed a pickup full of money to do the interior remodeling to get the [state's] certificate, that if [he] was to proceed further [he] would be borrowing a semi-truck full of money, and without his business [he] could not service the debt, and [he] needed to know where [he] stood." According to Lavoie, Ockinga then told him he had liked Lavoie's initial proposal that Lavoie had sent to Brown and him and, in Lavoie's words, "we were in a positive mode; 'go for it.'" Ockinga also said, in Lavoie's words, "we were going to save him a lot of money, we were closer, we were in the county * * * 'go for it; we will do business.'" According to Lavoie, Ockinga said Safecare would require Lavoie to submit a policies and procedure manual with which Lavoie's operation would comply; Ockinga suggested that Lavoies hire Jean Palladino, a former Safecare employee, to prepare such a manual. Ockinga also told Lavoie to resubmit his written proposal to Brown, Simcoe, and him, and he told Lavoie that Pierson had earlier visited Lavoie's facility at Ockinga's direction. Lavoie asked Ockinga if Steiner Corporation was going to submit a bid for another three years. Ockinga told him he had contacted Steiner several weeks earlier, had not had contact since, and "not to worry about it, period," in Lavoie's words.

According to Lavoie, when he left the June 17 meeting, he anticipated he would get a signed contract. In his words, he "figured it was the normal course of business when we do business up here." He thought that either Brown or Ockinga would sign the contract on Safecare's behalf.

By identical cover letters dated June 27, 1988, Lavoie resubmitted his written proposal to Brown, Simcoe, and Ockinga. In his cover letter Lavoie stated that Reuer had inspected and approved Lavoie's facili-

ty on June 16 and Lavoie was working on the exceptions or conditions which Reuer had listed. He referred to Reuer's letter dated June 20, a copy of which was enclosed. Lavoie's cover letter further stated that Reuer's conditions would be completed by July 27 and that Lavoie was, in Lavoie's words, "requesting a meeting with you and your staff to discuss the possibility of entering negotiations with your facility for the laundry business."

In addition to resubmitting to Safecare his written laundry proposal, Lavoie called Jean Palladino to see if he could hire her to prepare the policies and procedures manual. Lavoie and Palladino met on July 11, but apparently did not sign the written agreement under which he hired her until July 12 or shortly thereafter.

After Lavoie resubmitted his written laundry proposal on June 27, he called Ockinga and arranged a meeting. According to Lavoie, this meeting took place on or about July 7, 1988. Attending the meeting were Lavoie, Brown, Pierson, Ockinga, and Safecare infection control nurse Pat Moore. According to Lavoie, at this meeting he discussed the possibility of entering negotiations with their facility for the laundry business. Safecare representatives were to make an inspection of Lavoie's facility the next day. That inspection was the first one made by Safecare since discussions began in late April. Pierson and Moore made the inspection on July 8 and questioned Lavoie as to when various pieces of equipment would be installed and certain conditions completed.

Several days later Lavoie tried, unsuccessfully, to talk to Brown on the telephone. Finally, on July 12, while in Lander, Lavoie called Brown and talked to him. Brown told Lavoie there was no need to meet and Safecare was no longer interested. Brown told Lavoie he had a bad site report. Despite Lavoie's request to meet and discuss the situation, Brown told him he did not want to meet or talk. Brown told him he [Lavoie] might talk to Ockinga; then Brown hung up.

Lavoie went to the Lander Regional Medical Center and found Ockinga. Ockinga said there was a bad site report from Pierson's and Moore's July 8 inspection. They discussed the various site items raised by Ockinga, with Lavoie defending each one. Ockinga said perhaps he and Brown should look at the facility.

Six days later, on July 18, Lavoie called Reuer and asked him to again inspect the facility; he set it for July 22. Lavoie then telephoned Ockinga and told him about Reuer's upcoming inspection. Ockinga said he would talk to Brown and get back to him.

On July 22, Reuer inspected Lavoie's facility and told Lavoie to let him know when, in Lavoie's words, "all these things are done" and "there's no problem * * *." Lavoie concedes that the air-exchange unit had not arrived yet. By letter dated July 26, Reuer confirmed his inspection and listed three conditions: Lavoie had told him the air exchange unit would be available the middle of August; the fluorescent light tubes required protective sleeves; and the intersection of the outside walls with the floors needed to be tightly sealed from a sanitation standpoint.

In a telephone conversation on July 27, Ockinga told Lavoie that Brown and Pierson would visit the facility the next day. They visited the facility and discussed its clean appearance, the need for a certain door, installation of the air-exchange unit, and the status of the policies and procedures manual that Palladino was preparing for Lavoie. Lavoie said he would deliver the manual the next day; he asked Brown if he could have a decision to which Brown replied that he would meet with his staff and someone would get back to him.

The next day Lavoie got the manual from Palladino, took it to Ockinga, and talked to him. Ockinga told him Safecare's decision to go again with Steiner was final.

By letter dated August 10, 1988, Lavoie wrote Brown that he intended to sue Safecare for reneging on its promises. According to Lavoie's affidavit, by August 28, 1988, all the remodeling and equipment in-stallation, including the air exchange unit, were completed.

## DISCUSSION

### 1. *The Breach of Contract Claim*

#### A. *The Complaint*

We begin our analysis by parsing Lavoies' complaint to identify what kind of contract they pleaded. *See Davies v. Martel Laboratory Services Inc.*, 189 Ill. App.3d 694, 136 Ill.Dec. 951, 545 N.E.2d 475 (1989). In paragraph 5, Lavoies allege that on May 3 they submitted "their proposal and offer." This was the written laundry proposal which recited that Lavoies proposed doing Safecare's laundry for three years at a price of twenty-seven cents a pound. In this written proposal Lavoies said nothing about remodeling their facility, buying and installing equipment, and obtaining state approval in exchange for a Safecare promise to pay them for three years' laundry service. In paragraph 7, Lavoies allege that Krebs' June 8 letter stated "the bank was aware of the remodeling requirements of the contract and related costs." However, the letter states the bank was aware of the remodeling requirements "regarding" the contract about which there had been negotiations. Moreover, Lavoies admit there was no contract in existence on or around June 8. Indeed, Lavoies claim unequivocally in their appellate argument that it was not until June 17, when Ockinga uttered the words, "Go for it; we will do business," that an oral contract was formed. And at no time have the Lavoies claimed that a written contract ever existed.

In paragraph 8, Lavoies alleged that at a meeting during the week of May 24, Ockinga informed Lavoie that state certification approving Lavoies' remodeled facility "would also be a prerequisite to a contract between the parties for laundry services." As Mr. Lavoie's deposition testimony revealed, however, the only meeting that week between Lavoie and Ockinga was on May 24, and at that meeting Ockinga simply said, in Lavoie's words, "if we got certified * * * we would do business."

In paragraph 11, Lavoies alleged their facility received "a favorable rating and approval" from the state on June 16. In paragraph 12, Lavoies alleged that "Ockinga expressed satisfaction with *[Lavoies']* *proposal* * * * *[and] accepted [Lavoies']* offer and at that time the parties verbally and mutually agreed to do business together according to the terms discussed." (emphasis added).

In paragraph 20, Lavoies alleged that on May 3, pursuant to Safecare's request they "tendered an offer by proposal for health care institution linen and laundry services to [Safecare]." In paragraph 21, Lavoies alleged that on June 17 they "demonstrated that all conditions imposed by [Safecare] had been or could be met or surpassed by August 15, 1988, the date stipulated by [Safecare]"; Lavoies further alleged that at that meeting, "the parties agreed on all terms and conditions of a contract." Continuing this theme in paragraph 22, Lavoies alleged that at the June 17 meeting:

[Safecare] promised to purchase its * * * laundry services at a mutually agreed upon price per pound exclusively from [Lavoies] commencing on August 15, 1988, for a three (3) years period until August 14, 1991. In exchange [Lavoies] agreed to a certain schedule of delivery, and pick-up, certain policies and procedures in processing [Safecare's] linen and laundry, remodeling and refitting [their facility] to process [Safecare's volume], meeting the requirements and achieving certification from the [state] and to service all [Safecare's] laundry and dry cleaning needs during the stipulated period.

In paragraph 23, Lavoies alleged that *before* August 15, 1988, they incurred substantial expense and obligations by performing these conditions: obtaining financing, remodeling and refitting their facility, achieving state certification and commissioning a policies and procedures manual. In paragraph 24, Lavoies alleged that on July 29, 1988, Safecare repudiated the contract unequivocally. We find these allegations in paragraphs 23 and 24 rather curious in light of the undisputed facts from Mr. Lavoies' own testimony. He applied for and obtained financing voluntarily, not in exchange for or in reliance on Safecare's demand or promise, and he did so *before* his meetings with Ockinga on May 24 and June 17. Similarly, he began remodeling *before* his June 17 meeting at which he claims the oral contract was formed. Likewise, he testified that he received state approval on Reuer's inspection on June 16, the day before the parties allegedly formed the oral contract. Concerning the allegation that Safecare unequivocally repudiated the June 17 oral contract on July 29, Lavoie testified Safecare's Brown told him unequivocally on July 12 that Safecare was no longer interested. Also on July 12 or shortly thereafter, Lavoie signed a written contract with Jean Palladino to prepare the manual, but Lavoie failed to tell her to stop work even after Brown had told him that very day that Safecare was not interested.

## B. *The Summary Judgment*

After reading the parties' memoranda and hearing their arguments at a hearing and after considering the evidence in light of the Lavoies' complaint, the trial court concluded that no genuine issue of material fact existed about the contract which the Lavoies sought to enforce. The court found that the Lavoies were alleging the formation of an oral contract to be performed over a period greater than a year, namely three years. The court also found that when Mr. Lavoie left the June 17 meeting he anticipated there would be a signed contract.

In granting summary judgment for Safecare, the trial court held that the alleged oral three-year contract was void under Wyo.Stat. § 1–23–105 (1988), the statute of frauds, because there was no writing signed by Safecare, the party to be charged. The trial court also held that the Lavoies demonstrated no proof that Safecare perpetrated fraud on the Lavoies which would have estopped Safecare from invoking the statute of frauds.

## C. *Our Analysis*

■ In their appellate argument, both oral and written, the Lavoies contend, con-

trary to their complaint allegations, that their May 3 written proposal was an "offer" with which Ockinga expressed satisfaction and which Ockinga accepted, and that on June 17 the parties formed an oral unilateral contract. As explained by the Lavoies, this oral unilateral contract consisted of Ockinga's "promise" to buy Lavoies' laundry services for three years if Lavoies would remodel and refit their facility and obtain state approval of it. In the Lavoies' view of this unilateral contract, by their performance of these conditions (remodeling and refitting their facility and obtaining state approval) within one year's time, and arguably by August 15, 1988, as allegedly required by Safecare, they accepted Safecare's "offer" and had fully performed the oral contract. Since they had fully performed, they claim Safecare was bound to fulfill its promise to pay for three years' laundry service.

The Lavoies' oral unilateral contract theory is directly at odds with the type of contract they pleaded in their complaint. In paragraph 22, they alleged that in exchange for Safecare's promise to buy its laundry services for three years from the Lavoies, Lavoies "agreed" [promised] to adhere to a pick-up and delivery schedule, abide by policies and procedures, remodel and refit their facility, achieve state approval, and service Safecare's laundry and dry cleaning needs for three years. Indeed, as Safecare points out, Lavoies appear to have pleaded a bilateral contract, that is, a promise for a promise.[3] Safecare also points out that Lavoies did not fully perform their promise as pleaded since they have never done one day's worth of Safecare's laundry.

The Lavoies concede that if in fact the alleged contract were bilateral, as Safecare maintains, then it would be within the statute of frauds and, to be valid, have to be in writing and signed by Safecare, the party to be bound. Under a bilateral contract theory, the alleged oral contract would be invalid and, legally, no contract would exist.

We are inclined to conclude that the Lavoies' complaint pleaded the formation of an oral bilateral three-year contract for laundry services. We shall analyze the propriety of the summary judgment under the Lavoies' oral unilateral contract position, however, because that is the position they have presented to us. *See* 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 2.3, at 65 (1990). Let us be clear about that position. Lavoies claim the contract was this: Safecare, as the promisor/offeror, promised or made the "offer" to pay Lavoies to do Safecare's laundry for three years if Lavoies accepted that "offer" by performing the conditions of: 1) remodeling their facility, 2) purchasing and installing laundry equipment, and 3) obtaining state approval to operate a commercial laundry handling health care institution laundry. They claim that Safecare, through its agent Ockinga, made that promise or "offer" at the June 17 meeting when he uttered the words, "We will do business; go for it," in response to Lavoie's inquiry about needing to know where he stood before he requested a "semi-truck full of loan proceeds" to purchase laundry equipment. They claim that in exchange for and reliance on that "offer," they accepted that "offer" by performing, *i.e.*, remodeling, requesting additional loan proceeds, buying and installing equipment, obtaining state approval, and commissioning Jean Palladino to prepare the manual.

■ The Lavoies' unilateral contract position is untenable for a variety of reasons. To explain, we return to fundamental principles of contract and agency law. Whether an oral contract exists "depends on the intent of the parties and is a question of fact." *Wyoming Sawmills, Inc. v. Morris*, 756 P.2d 774, 775 (Wyo.1988). *See also Miller v. Miller*, 664 P.2d 39, 41 (Wyo. 1983); and *Jim's Water Service, Inc. v. Alinen*, 608 P.2d 667, 669–70 (Wyo.1980).

It is well established that an offer, acceptance, and consideration are the basic elements of a contract. The burden of proving a contract is on the one seeking to recover on it. *Black & Yates, Inc.*

**3.** 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 2.3 at 64–65 (1990).

v. *Negros–Philippine Lumber Company,* 32 Wyo. 248, 231 P. 398 (1924). This includes the burden of proving consideration.

*Miller,* 664 P.2d at 40 (citation omitted).

In *Continental Ins. v. Page Engineering Co.,* 783 P.2d 641, 651 (Wyo.1989) (citations omitted), this court observed:

It is an axiom of the law of contracts that, in the absence of a meeting of the minds, there is no contract. Thus, in an instance in which the terms of the contract are so uncertain that mutuality of agreement cannot be discerned, the contract is unenforceable because of uncertainty. Certainly, parties can create an implied contract by their conduct, but the conduct from which that inference is drawn must be sufficient to support the conclusion that the parties expressed a mutual manifestation of an intent to enter into an agreement. Although the question of whether particular conduct is sufficient to support a finding that an implied contract exists is generally submitted to a trier of fact, the question may be resolved by summary judgment if reasonable minds could not differ.

■ In their complaint the Lavoies alleged that Safecare through its agent Ockinga made the "offer" and that they accepted that "offer" by performance. Implicit in this allegation is the claim that Ockinga had authority to bind Safecare to a contract. A party claiming an agency relationship, such as the Lavoies here, has the burden of proof on that issue as well as on the issue of the scope of the agent's authority. *Stone v. First Wyoming Bank N.A., Lusk,* 625 F.2d 332, 343 (10th Cir. 1980); *Czapla v. Grieves,* 549 P.2d 650, 653–54 (Wyo.1976).

■ In support of Safecare's summary judgment motion, Safecare submitted Ockinga's deposition testimony that he had no authority to bind Safecare, a corporation. In the face of Safecare's summary judgment evidence that its agent, Ockinga, had no authority to contract with the Lavoies, the burden on that issue of fact shifted to the Lavoies. They failed to counter with any evidence that Ockinga possessed such

authority. In regard to this matter, a brief review of their knowledge is revealing. In both the April 29 and June 17 meetings between Lavoie and Ockinga, the latter asked the former to send his written proposals to both Brown and Simcoe, the chief administrators of Safecare's health care facilities. The Lavoies did so. In Lavoies' May 20 loan proposal to the bank, Lavoie expressly stated he would show the state's certification to Safecare's board and ask for a signed contract. This is strong evidence the Lavoies knew that only Safecare's board had authority to contract. They knew they were dealing with a corporation. A corporation's comptroller, like Ockinga, generally has no authority to contract on behalf of the corporation. Harry G. Henn and John R. Alexander, *Laws of Corporations* § 225, at 595–99 (3d ed. 1983). Under Wyoming statutory law, a corporate officer, such as comptroller, has only such authority and duties as set forth in the corporate bylaws or as prescribed by the board of directors. Wyo.Stat. § 17–16–841 (1989). *Cf., United States v. Marin,* 651 F.2d 24, 28–29 (1st Cir.1981). Also under Wyoming law, a third person, such as the Lavoies, has a duty to exercise reasonable diligence to determine the scope of an agent's authority. *Trails Motors, Inc. v. First Nat'l Bank of Laramie,* 76 Wyo. 152, 175, 301 P.2d 775, 784 (1956). Having examined the summary judgment evidence in a light most favorable to the Lavoies, we find that no genuine issue of material fact exists about the scope of Ockinga's authority. We hold as a matter of law that he had no authority to contract on Safecare's behalf and, consequently, no oral contract came into being at the June 17 meeting.

Another reason exists to explain why the Lavoies' unilateral contract position is untenable. There was no consideration between Safecare and the Lavoies. As Restatement (Second) of Contracts § 75 (1981) provides, the consideration must both be sought by the promisor (Safecare) in exchange for its promise and be given by the promisee (Lavoies) in exchange for its promise. Under the undisputed facts, Lavoies' actions of seeking and obtaining the

loan from Krebs, undertaking remodeling, and seeking and obtaining state approval on June 16 were not induced by Ockinga's alleged promise uttered on June 17. As explained in Farnsworth, *supra*, § 2.7 at 73:

> Only if [performance] has not yet been taken when the promise is made can the promisor be bargaining for it when making the promise. If the [performance] has already been taken, the promisor cannot be seeking to induce it. Such "past consideration"—[performance] already taken before a promise is made—cannot be consideration for the promise.

The facts clearly show that both Lavoies and Safecare intended that the purpose of negotiations was to achieve a written contract, not an oral one. Lavoies knew that Safecare's existing contract with Steiner Corporation was in writing. Lavoies' loan proposal to Krebs expressly stated they envisioned a written contract signed by Safecare's board. Ockinga told Lavoies to resubmit a written proposal to Brown and Simcoe. When Lavoie left the June 17 meeting he contemplated a written contract. In Lavoie's June 27 cover letter he expressly stated he was requesting a meeting "to discuss the possibility of entering negotiations * * *." Reasonable minds cannot differ on the conclusion to be drawn from this undisputed evidence. No contract came into being on June 17.

### 2. *Promissory Estoppel*

#### A. *The Complaint*

In their complaint the Lavoies assert a promissory estoppel claim based on the following allegations. They allege that at the June 17 meeting Safecare, by agent Ockinga's conduct, accepted their offer and promised to use Lavoies' laundry service for a three-year period. Lavoies allege that Safecare reasonably expected its promise to induce Lavoies' action. In that regard, the Lavoies contend that inducements were manifested by the following Safecare acts: at the June 17 meeting agent Ockinga asked Lavoies to obtain the remainder of available financing and complete the remodeling and refitting of their laundry; at that meeting agent Ockinga voiced the expectation that Lavoies would prepare a policy and procedure manual and recommended Jean Palladino to prepare it; and on July 8, Pierson and Moore inspected the laundry facility, making explicit Safecare's continuing supervision and expectation of the Lavoies. The Lavoies claim that they incurred indebtedness, undertook construction on and equipped their facility, hired Ms. Palladino, and obtained state certification because of Safecare's inducements. They conclude by alleging they substantially changed their position and relied, to their detriment, on Safecare's promise and misleading declarations.

#### B. *Promissory Estoppel Law*

Recently, this court reviewed and applied its promissory estoppel jurisprudence in a similar case. The elements of promissory estoppel are:

> (1) a clear and definite agreement; (2) proof that the party urging the doctrine acted to its detriment in reasonable reliance on the agreement; and (3) a finding that the equities support the enforcement of the agreement.

*Inter–Mountain Threading, Inc. v. Baker Hughes Tubular Services, Inc.*, 812 P.2d 555, 559 (Wyo.1991) (quoting *Provence v. Hilltop Nat'l Bank*, 780 P.2d 990, 993 (Wyo.1989)).

> [In *Provence* ], we looked to *National Bank of Waterloo v. Moeller*, 434 N.W.2d 887 (Iowa 1989). *Moeller* correctly informs us that, with respect to the first element, a clear and definite agreement, the "dual emphasis on clarity and inducement parallels the Restatement (Second) definition of an agreement for purposes of promissory estoppel as '[a] promise which the promisor should reasonably expect to induce action * * * on the part of the promisee.' *Restatement (Second) of Contracts* § 90 (1981)."

*Inter–Mountain Threading*, 812 P.2d at 559 (quoting *Nat'l Bank of Waterloo v. Moeller*, 434 N.W.2d 887, 889 (Iowa 1989)).

Measuring Ockinga's June 17 oral statements against the first element, we

cannot conclude they are promises clear and unambiguous in their terms. His conversational remarks are, at best, mere expressions of hope and opinion in an obviously preliminary negotiation context. In somewhat analogous preliminary negotiation contexts, we have viewed similar remarks as mere expressions of opinion and agreements to agree. For instance, in *Inter-Mountain Threading*, 812 P.2d at 558, we held that the manager's oral statement "we can do a deal" was not a clear and definite promise, but rather a mere expression of hope and opinion in an obviously preliminary negotiation context. *See also Czapla*, 549 P.2d at 653 (owner's agent made such remarks as "This was as good as sold, that the deal would be final"); *Roth*, 684 P.2d at 95 (bank director made such remarks a "Things look very good at 'this time" and "You don't have any * * * problems as long as I own the bank"); and *Doud v. First Interstate Bank of Gillette*, 769 P.2d 927, 928 (Wyo.1989) (bank president told loan applicant that proposed line of credit was "not any problem"). *See also Rialto Theatre v. Commonwealth Theatres, Inc.*, 714 P.2d 328, 334 (Wyo.1986) (portion of lease agreement "is merely an agreement to agree in the future"). In similar cases other courts have likewise found such expressions made in the course of preliminary negotiations not to be promises. *See e.g., Jungmann v. St. Regis Paper Co.*, 682 F.2d 195, 197 (8th Cir.1982); *Blanton Enterprises, Inc. v. Burger King Corp.*, 680 F.Supp. 753 (D.S.C.1988); *Tull v. Mr. Donut Dev. Corp.*, 7 Mass.App. 626, 389 N.E.2d 447, 449–50 (1979); *Pacific Cascade Corp. v. Nimmer*, 25 Wash.App. 552, 608 P.2d 266 (1980).

■ With respect to the second element of promissory estoppel, that the Lavoies acted to their detriment in reasonable reliance on Ockinga's oral remarks on June 17, the uncontroverted evidence, most of which is taken from Lavoie's own deposition and affidavit, shows that Lavoies had acted and incurred most of their obligations before the June 17 meeting at which Ockinga made his remarks. Lavoies cannot rely upon statements not yet made when they took action and incurred legal obligations.

We hold they did not change their position or suffer damages in reliance upon Ockinga's statements.

With respect to Lavoies' incurring damages after Ockinga's statements on June 17, Lavoies have failed to show that their reliance on those statements was reasonable. The ingredients of Lavoie's own loan proposal to his bank, as well as his deposition, reveal him to be an experienced business person. For example, he knew that:

▲ Safecare had a written three-year laundry service contract with Steiner Corporation;

▲ written contracts were the norm in business dealings of this nature;

▲ his written proposals were being reviewed by Safecare's hospital administrators Brown and Simcoe;

▲ at the June 17 meeting Ockinga told him to resubmit his written proposal to those administrators and on leaving that meeting he anticipated there would be a written contract; and

▲ Safecare acted through a board of directors (Lavoie's own loan proposal proposed obtaining a signed contract from that board).

Finally, when Lavoie resubmitted his written proposal on June 27, he stated in his cover letter that he was requesting a meeting for the purpose of entering into negotiations. He knew that Ockinga was only a financial officer of a corporation, and he did nothing to determine the nature and extent of Ockinga's authority to act on Safecare's behalf.

Lavoie did not contract with Jean Palladino to prepare the policy and procedures manual until July 12 or a few days later; it was on July 12 that Brown told him there would be no contract. And, yet, Lavoie took no action to stop Palladino's preparation work after that.

In many respects the Lavoies' claim is reminiscent of the land developer's (Roth) claim in *Roth*, 684 P.2d at 93. There, this court upheld a summary judgment in favor of the alleged promisor. Roth had entered into extensive negotiations with the bank for a loan in order to develop a subdivision.

He had numerous conversations with the bank's loan officer, other bank officials, and Keith West, a bank director. One evening Roth hosted a dinner party in order to show an official from the Federal National Mortgage Association (FNMA) that the development was a good project to finance. Bank director West attended at Roth's invitation. Before dinner a guest asked West about the status of Roth's loan, to which West replied, "Things look good at this time." At dinner West was asked when Roth could start writing checks on the loan, to which West replied, "We'll be ready before [FNMA] will." Roth asked West about the loan's status, saying, "If I didn't have that loan I was in real trouble." West replied, "You don't have any * * * problems as long as I own the bank."

Roth immediately ordered a deed to the land and ordered contractors to start turning the dirt. Two months later the bank denied the loan. Roth contended that the course of negotiations, capped by West's remarks at the dinner party, induced him to incur substantial expense; he asserted that both West and the bank were estopped from asserting the nonexistence of the construction loan.

In affirming the summary judgment against Roth, this court found that the uncontroverted evidence, most of which was taken from Roth's deposition, showed that Roth had entered into most of his contracts before the dinner party and West's remarks. This court held that Roth could not rely upon a statement not yet made when he entered into these contracts and incurred legal obligations. This court found Roth did not change his position or suffer damages in reliance upon West's statements. *Id.* at 97.

With respect to Roth's incurring damages after West's representations, this court said Roth had to show that his reliance on those representations was reasonable. On this point the court noted that Roth was an experienced business person with a wide background of obtaining loans, that bank representatives had informed Roth in various conversations that they needed more information, that Roth should

have known that he did not have a loan or even a loan commitment from the bank until a bank official or loan officer told him the loan was approved. In view of this evidence, this court held that Roth's reliance upon West's statements at the dinner party was unreasonable as a matter of law. This court further observed Roth knew that West did not own the bank, did not make loans, and was a member of a board that makes decisions as a board. *Roth,* 684 P.2d at 97.

We find our analysis in *Roth* compelling here. In the face of undisputed evidence, we hold that Lavoie's reliance upon Ockinga's remarks on June 17 was unreasonable as a matter of law.

■ With respect to the final element of promissory estoppel, whether the equities support enforcement of the alleged promise, we treat that as a question of law. *Inter–Mountain Threading, Inc.,* 812 P.2d at 560. On the record before us there is no showing that Lavoies are unable to use their remodeled laundry facility and additional equipment to good advantage, and no showing they are unable to obtain laundry contracts. To the contrary, the undisputed evidence reveals they enjoy increased business and have been moderately successful in developing and retaining new business. Their success in this regard conforms to some of the expectations expressed in their May 20, 1988, loan proposal to their banker. We hold that the equities do not support enforcement of the alleged promise.

■ We note in conclusion that since the Lavoies have failed to create a genuine issue of material fact relating to Ockinga's authority to bind Safecare, the lack of that authority is also fatal to Lavoies' claim of estoppel against Safecare as principal. *United States v. Certain Parcels of Land in the City of Cheyenne,* 141 F.Supp. 300, 309. (D.Wyo.1956).

### 3. *Fraud*

#### A. *The Complaint*

In their fraud claim the Lavoies alleged that Safecare agent Ockinga at the June 17 meeting made the material representation

that the parties would "do business." Lavoies alleged that representation was false when made and Safecare at that time knew it was false. As proof of Safecare's intention on June 17 not to form an exclusive relationship with the Lavoies, Lavoies point to Safecare's contemporaneous negotiations with Steiner Corporation on a renewal of the existing written laundry services contract.

### B. *The Elements of a Fraud Claim*

In *Duffy v. Brown*, 708 P.2d 433, 437 (Wyo.1985) (citations omitted), this court stated:

The elements of a claim for relief for fraud are a false representation made by the defendant which is relied upon by the plaintiff to his damage, the asserted false representation must be made to induce action, and the plaintiff must reasonably- believe the representation to be true. A plaintiff who alleges fraud must do so clearly and distinctly, and fraud will not be imputed to any party when the facts and circumstances out of which it is alleged to arise are consistent with honesty and purity of intention. Fraud must be established by clear, unequivocal and convincing evidence, and will never be presumed.

The Lavoies' fraud claim fails for several reasons. First, as with the promissory estoppel claim, Ockinga's lack of authority is fatal to the fraud claim against Safecare as principal. *Certain Parcels*, 141 F.Supp. at 309. Second, it is clear from the record that a showing of fraud was not made by clear and convincing evidence. The uncontroverted facts show that Lavoie did not rely on Ockinga's June 17 statement in submitting the May 3 written proposal in which they agreed to meet or exceed all state regulations pertaining to health care institutional type laundry and stated in their cover letter that "we now have the capability to handle all of your health care institutional laundry * * * needs." Nor may Ockinga's statement be claimed as the reason for arranging Reuer's visit to secure state approval of their facility or to meet with their accoun-

tant and prepare a loan proposal which was subsequently submitted to their bank on May 20 and approved on May 21. Likewise, it cannot be seriously argued that Ockinga's statement induced Lavoies to initiate the remodeling of their facility which encouraged their banker to write his June 8 letter enhancing their credibility with Safecare as a prospective client, or to meet with Reuer on June 16 to obtain state approval of their facility.

Moreover, in his deposition Lavoie could not designate the factual basis for their fraud claim. When asked what facts he relied on for the allegation that Ockinga knew his statement was false and was intentionally misleading Lavoie, Lavoie replied, not with facts, but with only conclusions and opinions, such as "we don't have the contract. We're in financial straits because we did what he told us to do." In *Duffy*, faced with a similar response to a similar question, this court found no basis for a fraud claim. *Duffy*, 708 P.2d at 438.

The Lavoies claim Ockinga's testimony, *viz.*, that the purpose of his negotiations with them was to provide Safecare with an option to Steiner Corporation, creates a genuine issue of material fact as to whether on June 17 he knew his statement was false. We disagree. It is not uncommon in business dealings for the parties to seek the best terms possible, to engage in similar negotiations with two or more parties in order to determine where the best deal is. Businesses are presumed to act in their own self-interest. The facts and circumstances surrounding Ockinga's seeking laundry service options for Safecare are consistent with honesty and purity of intention. *Duffy*, 708 P.2d at 437. We hold there is no genuine issue of material fact about Safecare's intention. Lavoies' fraud claim fails.

In summary, we affirm the trial court's summary judgment against Lavoies on their claims of breach of an oral contract, promissory estoppel and fraud.

THOMAS, Justice, dissenting.

I, too, must dissent from the holding of the majority that the summary judgment in

this case should be affirmed. I agree with much of what is said in the separate dissent of Justice Urbigkit, but I acknowledge that the issue of apparent authority may not be one of material fact if the Lavoies are foreclosed by the statute of frauds or other legal theories. Furthermore, I do not see the theory of part performance in the same light as Justice Urbigkit. For these reasons, I do not join in Justice Urbigkit's opinion. Instead, my concern is with the disposition of the theory of promissory estoppel. In my view, the majority has treated a question of fact as a question of law and has applied the standard for reviewing a judgment notwithstanding a verdict to justify the summary judgment.

I do note, with respect to apparent authority, a contradiction on page 12 of the slip opinion, where the majority first says that the comptroller generally has no authority to contract on behalf of the corporation, but then includes the comptroller among the corporate officers with such authority pursuant to Wyoming statutes. Actually the statutes make the issue depend upon the corporate bylaws and the authority of an officer described in the bylaws who can assign the duties of others. The record in this case does not foreclose Ockinga's authority to contract, and there are ample indications of his apparent authority.

The thrust of the majority opinion is that there is no genuine issue of material fact with respect to the reliance element of promissory estoppel because that is a question of law. As I analyze the majority opinion, the first fallacy presented in resolving the case is contained in that thesis. I don't agree. Whether the Lavoies reasonably relied upon the conduct of Ockinga and other representatives of Safecare is a question of fact, not of law. I am satisfied that, as is generally true of subjective factors, the reasonableness of the conduct of a party is a question for the trier of fact to resolve. The majority attaches no significance to the various ways in which Lavoie

said he had relied upon the conduct of Safecare and its representatives. Instead, the majority says he could not have relied upon that conduct because, as a matter of law, it was not reasonable for him to rely upon such conduct.

I am inclined to relate this situation very directly to our case of *Inter–Mountain Threading, Inc. v. Baker Hughes Tubular Services, Inc.,* 812 P.2d 555 (Wyo.1991). The majority rely substantially on that case, but it is important to recall that there we were reviewing an order granting a judgment notwithstanding a verdict. Therein lies the second fallacy; the majority treats this case like one in which a directed verdict should be granted in affirming the summary judgment.

In *Western Surety Co. v. Town of Evansville,* 675 P.2d 258, 264 (Wyo.1984), we adopted the following language quoted in *Hughes v. American Jawa, Ltd.,* 529 F.2d 21, 25 (8th Cir.1976):

It is only where it is perfectly clear that there are no issues in the case that a summary judgment is proper. Even in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable parties to evade jury trials or have the judge weigh evidence in advance of its being presented. *Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir), *cert. denied,* 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951); *accord, Williams v. Chick,* 373 F.2d 330, 331 (8th Cir.1967).[1]

I am satisfied that, at least subliminally, the majority was sensitive to this rule, but still it substituted the standard for reviewing a judgment notwithstanding the verdict into this summary judgment case. That

---

1. In *Cody v. Atkins,* 658 P.2d 59, 61 (Wyo.1983), we quoted from *Town of Jackson v. Shaw,* 569 P.2d 1246, 1250 (Wyo.1977), to reaffirm the standard for reviewing a directed verdict, and went on to hold that "[t]he test then for grant-

ing a J.N.O.V. is virtually the same as that employed in determining whether a motion for directed verdict should be granted or denied." *Cody,* 658 P.2d at 62.

standard is summarized in *Inter–Mountain,* 812 P.2d at 558–59:

When this appellate court is faced with a JNOV question, we undertake a full review of the record without deference to the views of the trial court. *Cody v. Atkins,* 658 P.2d 59, 61–62 (Wyo.1983). In determining whether a JNOV motion should be granted, we consider "whether the evidence is such that without weighing the credibility of the witnesses, or otherwise considering the weight of the evidence, there can be but one conclusion reasonable persons could have reached * * *." *Erickson v. Magill,* 713 P.2d 1182, 1186 (Wyo.1986). In our review we consider the evidence favorable to the nonmoving party, giving it all reasonable inferences. *Carey v. Jackson,* 603 P.2d 868, 877 (Wyo.1979). A court should cautiously and sparingly grant JNOV motions. *Erickson,* 713 P.2d at 1186.

Read carefully, it is apparent the majority is saying that reasonable persons could reach only one conclusion from the facts incorporated in this record. That is not the standard for summary judgment review, however, where we look only for issues of fact, not resolutions. In order to avoid that hurdle, the majority has described the question of reasonable reliance as one of law rather than acknowledging it is a question of fact as to which there is a genuine issue in this instance.

I would hold that there is a genuine issue of material fact in this case with respect to the elements of promissory estoppel as articulated in *Inter–Mountain.* I would, therefore, reverse the summary judgment in favor of Safecare, and I would remand the case for trial on that theory, as pleaded by the Lavoies.

URBIGKIT, Justice, dissenting.

In dissenting to the present decision, I object to a very serious procedural appellate review misdirection now utilized. This error is found in the substantive factual decision the majority now makes on a non-litigated issue not previously considered by the trial court, counsel or presented by appellate briefing. In result, the majority makes a first time considered factual determination in the appellate decision. We eliminate participation of counsel in the decisional process and combine the trial court nisi prius fact finding with appellate review to approve summary judgment on a concept completely not argued and factually undeveloped by anyone.

This case, previously non-litigated, is now decided on the question of the actual or ostensible authority of the negotiating comptroller to make a binding laundry service contract while acting and negotiating within his duties as the chief financial officer of the hospital.

To understand the structure of this appeal, we must recognize that the trial court applied the statute of frauds to grant summary judgment disposition as a matter of law, *Cordova v. Gosar,* 719 P.2d 625, 636 (Wyo.1986) (stage five), for all elements of the claim except fraud. In adversely determining the fraud allegation, the trial court found there were insufficient grounds in pleading or evidence to sustain the claim against a summary judgment disposition. *Id.* at 635–36 (stages one and four). The trial court was neither presented with a contested claim nor thereafter made a finding that Mike Ockinga, "Chief Financial Officer of Defendant," lacked authority to negotiate or make the deal which is the subject matter of this litigation. The majority now extracts from the evidence a factual conclusion which was not developed by assertion of affirmative defense or briefing argument. This result is achieved without citation of authority demonstrating why Ockinga, as the comptroller and chief financial officer of the hospital, would not have authority to negotiate a relatively modest laundry contract.

Within the broad sweep of summary judgment application, the majority has consequently shifted its review from considering the matter of law resolution to now addressing a factual concern by decision that there is no conflict in the evidence. Compare *Cordova* summary judgment (stage five) with the *Cordova* controlling legal principle ratio decidendi that no factual issue exists (stage six). The difference

in application of principles of appellate review is divided by a gap figuratively as wide as the Grand Canyon. If the statute of frauds applies, issues of authority are not involved. Any decision where the title and character of the officer of negotiation is similar to what is found here overtly presents actual and apparent authority concepts of factual conflict. Affirming the fact finding by the trial court even with a grant of summary judgment might be one thing, a nisi prius fact finding function by this court is quite another.

Considering we are deciding an issue that was never litigated, I am forced to conclude on this record that the majority is entirely wrong in its decision to justify the summary judgment that was granted by the trial court based on statute of frauds. Since ostensible authority has never been in question by pleading, argument, evidence or briefing, we now embark on this fact finding exhibition with a very cloudy record.

In initial complaint, Lavoie claimed negotiatory sessions with "Mike Ockinga, Comptroller for and agent of defendant LVRMC, in Ockinga's business office in the LVRMC to discuss a relationship which would involve the plaintiffs providing laundry services to defendant Safecare." Lavoie also alleged negotiations during an extended course of meetings, including the exchange of correspondence, and then stated:

> Mr. Ockinga expressed satisfaction with plaintiffs' proposal, location, and their price for laundry services, which amounted to a $10,000.00 savings to the defendant per year. Mr. Ockinga accepted plaintiffs' offer and at that time the parties verbally and mutually agreed to do business together according to the terms discussed. Mr. Ockinga encouraged Mr. Lavoie to obtain the remaining financing and complete the remodeling and refitting required by defendant.

Further, Lavoie contended:

17. On July 29, 1988, plaintiffs had met or surpassed all the conditions mandated by defendant and notified defendant thereof. * * *

\*  \*  \*  \*  \*  \*

21. On June 17, 1988, plaintiffs demonstrated that all conditions imposed by the defendant had been or could be met or surpassed by August 15, 1988, the date stipulated by defendant. During the June 17th meeting between Mr. Lavoie and Mr. Ockinga, the parties agreed on all terms and conditions of a contract.

22. On that occasion defendant promised to purchase its health care institution linen and laundry services at a mutually agreed upon price per pound exclusively from plaintiffs commencing on August 15, 1988, for a three (3) year period until August 14, 1991. In exchange plaintiffs agreed to a certain schedule of delivery, and pick-up, certain policies and procedures in processing defendant's linen and laundry, a particular price per pound for processing defendant's linen and laundry, remodeling and refitting Daisy Cleaners to process the volume of linen and laundry generated by defendant, meeting the requirements and achieving certification from the Wyoming Department of Health and Social Services and to service all defendant's laundry and dry cleaning needs during the stipulated period.

In answer, Safecare Health Service stated in part:

> Defendants admit that certain meetings between Mike Ockinga and Plaintiffs occurred wherein Plaintiffs and Mr. Ockinga discussed a potential business relationship in which Plaintiffs' cleaning establishment might be utilized to process hospital laundry. Defendants, however, deny all other allegations contained in paragraph 4 of Plaintiffs' Complaint.

Generally, Safecare Health Service answered by denial of separate paragraphs which in many cases were obviously true or, if not true, could not have been known to be untrue by them. Of importance, however, are the affirmative defenses which were separately stated as the following:

### First Affirmative Defense

As a further and separate defense, Defendants state that Plaintiffs' claims and causes of action brought against them fail to state claims for which relief can be granted.

### Second Affirmative Defense

As a further and separate defense, Defendants state that Plaintiffs failed to comply with the required prerequisites which were mandated before any contract could be negotiated.

### Third Affirmative Defense

As a further and separate defense, Defendants allege that there has been no consideration given and/or that there has been a failure of consideration which bars Plaintiffs' contract claims.

### Fourth Affirmative Defense

As a further and separate defense, Defendants allege that Plaintiffs' claims are barred by the statute of frauds.

### Fifth Affirmative Defense

As a further and separate defense, Defendants allege that Plaintiffs' claims are barred by the applicable statute of limitations.

A scheduling order (order for pretrial) was entered by the trial court on November 15, 1989, which required the following five identified items:

1. Each element of each cause of action, and defense, and a reference to the witnesses, admissions and documents and exhibits to prove the element.

2. The contested issues of law, with a brief citation of authority for counsels' position.

3. The facts established by pleadings, admissions and stipulations.

4. The contested issues of fact.

5. Each witness, with a succinctly detailed summary of the testimony of each.

In accord, Safecare Health Service's designation of expert witnesses included:

Mike Ockinga, Lander Valley Medical Center, Lander, WY, in addition to his fact testimony, may testify regarding the proper financial management and contracting policies and procedures of hospitals and other health care institutions; all matters that may be raised in his deposition.

No witness was listed to testify about ostensible or actual authority.

Safecare Health Service filed extended interrogatories which, in addition to the normal introduction and definitions, included in part:

7. Identify all persons present at the meeting between you and Mike Ockinga held on May 2, 1988, and state the exact words spoken by each person at such meeting, if possible. If it is not possible to state the exact words spoken, please state as specifically as possible the substance of the words spoken by each person at the meeting.

8. Identify all persons present at the meeting between you and Mike Ockinga held on May 9, 1988, and state the exact words spoken by each person at such meeting, if possible. [I]f it is not possible to state the exact words spoken, please state as specifically as possible the substance of the words spoken by each person at the meeting.

9. Identify all persons present at the meeting between you and Mike Ockinga held on May 24, 1988, and state the exact words spoken by each person at such meeting, if possible. If it is not possible to state the exact words spoken, please state as specifically as possible the substance of the words spoken by each person at the meeting.

10. Identify all persons present at the meeting between you and Mike Ockinga held on June 17, 1988, and state the exact words spoken by each person at such meeting, if possible. If it is not possible to state the exact words spoken, please state as specifically as possible the substance of the words spoken by each person at the meeting.

11. Identify all persons present at the meeting between you and Mike Ockinga held on July 29, 1988, and state the exact words spoken by each person at such

meeting, if possible. If it is not possible to state the exact words spoken, please state as specifically as possible the substance of the words spoken by each person at the meeting.

12. Identify all persons participating in, or overhearing, the phone conversation between you and Mike Ockinga held on June 16, 1988, and state the exact words spoken by each person in that conversation, if possible. If it is not possible to state the exact words spoken, please state as specifically as possible the substance of the words spoken by each person at the meeting.

13. Identify all persons present at the meeting between you and Mike Ockinga held on July 8, 1988 involving Don Pearson, Pat Moore and Mr. Lavoie, and state the exact words spoken by each person at such meeting, if possible. If it is not possible to state the exact words spoken, please state as specifically as possible the substance of the words spoken by each person at the meeting.

The interrogatories totalled ten pages plus the signature and certification as the eleventh page and addressed in no regard questions of authority of Ockinga to negotiate and commit. Lavoie's first set of interrogatories to Safecare Health Service of eight pages similarly did not include any questions relating to Ockinga's authority as comptroller and chief financial officer.

The litigation never reached the stage where pretrial memoranda in response to the scheduling order and order for pretrial were answered since the proceeding found an earlier end. The trial court sustained Defendant's Motion to Dismiss the Plaintiffs' Third Claim for Relief and for Summary Judgment on All Other Claims on the "grounds that there are no genuine issues of material fact and Defendant is therefore entitled to judgment as a matter of law." That final order came following exhaustive briefing by Safecare Health Service which had first addressed the issue of duty of good faith to be enforceable under Wyoming law as a separate claim and then that "the breach of contract claim is barred by the statute of frauds."

Safecare Health Service's posture was summarized in its stated conclusion:

Lander Valley is entitled to a dismissal of the third claim for relief based on the covenant of good faith and fair dealing because that covenant cannot form an independent basis for relief. Lander Valley is entitled to judgment as a matter of law on the breach of contract claim because any oral contract is rendered void by the Wyoming statute of frauds. The Lavoies' claim for promissory estoppel is subject to summary judgment on behalf of Lander Valley under the *Turner* case because Mr. Lavoie expected a written contract to be executed. Under these circumstances, the statute of frauds cannot be overcome by the doctrine of promissory estoppel. Finally, Lander Valley is entitled to summary judgment on the fraud claim for two reasons. First, Mr. Lavoie expected a written contract and is therefore precluded from claiming reasonable reliance on any oral understandings. Second, despite repeated questioning, Mr. Lavoie was unable to offer any clear and convincing evidence that showed that Mr. Ockinga had specific intent to defraud during the critical meeting of June 17, 1988.

In its decision, the trial court initiated its factual review:

On April 29, 1985, Plaintiff Philip H. Lavoie made an initial sales call on Mike Ockinga, Chief Financial Officer of Defendant. Ockinga expressed interest in Plaintiffs' business since it was more local than a Casper firm providing laundry services to Defendant. Ockinga told Lavoie that the existing contract would expire in August, 1988 and he asked Lavoie to submit a written proposal to Dave Brown, Administrator of Defendant hospital and Hugh Simco, Administrator of Defendant's sister facility, Pine Ridge Hospital.

After detailing specifically the various meetings conducted between Ockinga and Lavoie, the trial court held that the statute of frauds, Wyo.Stat. § 1–23–105, precluded enforcement of any oral agreements and then stated:

The supposed "contract" which Plaintiffs claim was entered into between them and Defendant is in violation of the Wyoming Statute of Frauds and is therefore void.

\* \* \* Defendant's Motion for Summary Judgment in this matter should be granted.

Although the subject of actual or ostensible authority was obviously never factually developed by either litigant in interrogatory or deposition examination, the only place where something appears which is the basis of the majority's decision, occurred during the deposition examination of Ockinga, only part of which is found in the record:

Q. Do you recall telling Mr. Lavoie that the hospitals and him would do business, during this meeting on June 17, 1988?

A. Would you repeat that question, please?

Q. Do you recall telling Mr. Lavoie at the end of the meeting on June 17, 1988, that the hospitals and him would do business, or words to that effect?

A. I deny saying that because I was never in a position—it is not within the purview of my authority to do that, and I've been in this business for long enough to know better than to do that.

(Discussion off the record.)

MR. MICHAEL: Had you completed the \* \* \* answer to that or do you know?

MR. OCKINGA: I believe so.

Q. (MR. VINCENT) The long and short of it—or maybe it's the short of it—is, you flatly deny ever saying to Mr. Lavoie that the hospitals would do business with his cleaners, or words to that effect?

A. I categorically deny saying that the hospitals definitely, without question, would do [page ended].

[The next page is not included in the record now presented for review by this court].

As previously stated, counsel has not been permitted to fully develop and argue the factually dispositive issue. In searching the record on this issue, we find the affidavit of Loretta Richey, which states in part:

Loretta Richey, of lawful age and being first duly sworn upon her oath, deposes and states as follows:

1. That during the summer of 1988 your Affiant was employed by defendant as the medical staff coordinator; that Affiant's office was located in the administrative offices of the Lander Valley Regional Medical Center; that your Affiant's office was located approximately 10 feet from the desk of Cyd Freese;

2. That Affiant, Cyd Freese, and Mike Ockinga had a conversation in the administrative offices of the Lander Valley Regional Medical Center pertaining to Phil Lavoie and the Daisy Laundry; that the conversation took place some time in late July or early August 1988 after Mr. Dave Brown had told Mr. Lavoie that Mr. Lavoie would not be permitted to do the hospitals' laundry; that Mr. Ockinga said to Cyd Freese, and your Affiant that there was a verbal agreement with Mr. Lavoie which provided generally that Mr. Lavoie was to complete the remodeling and, in return, be able to do both the hospital and Pine Ridge hospital's laundry; that Mr. Ockinga said generally that he knew all along this would turn into a bad thing; that even though they didn't have a written contract at that point, there had been a verbal agreement to give Mr. Lavoie the laundry contract when the remodeling was completed; that Mr. Ockinga said that he and Dave Brown knew of and, in fact, made this verbal agreement with Mr. Lavoie; that Cyd Freese, Mike Ockinga, and your Affiant knew that Mr. Lavoie had borrowed money to complete the remodeling required to do the hospital and Pine Ridge's laundry[.]

Furthermore, Lavoie stated in his affidavit:

2. That I did not intend, nor did I say to any of defendant's employees, that a contract had to be reduced to writing prior to the time or as a condition to me remodeling or purchasing equipment for the Daisy Laundry;

3. That Mr. Ockinga never, ever, told me that he did not have the authority to

enter into a contract on behalf of the hospital; that I deny such to be the case and state that from the words, activities, and representations of Mr. Ockinga, he did have such authority[.]

Procedurally, it is inappropriate to affirm the summary judgment with this posture of the undeveloped trial court record. It is bad enough if two bases were submitted to the trial court and the decision was rendered on only one, but here it is even more unjustified where the trial court was not provided the basis to even consider the decision this majority now renders.

The authorities are extensive and generally consistent. I would find from a recent Texas case an approach that we should follow which, in itself, only addresses the more confined area where at least the issue was presented first to the trial court. *Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498 (Tex.App.1991).

What, then, of a summary judgment order that expressly states the ground on which it is granted, when the underlying motion contained other independent grounds on which summary judgment was sought? We conclude that the ground specified in the judgment is the only one on which the summary judgment can be affirmed, for the following reasons. First, where a party has sought summary judgment on grounds A and B, a judgment expressly granting summary judgment on ground A, without mentioning ground B, can only be construed to mean that the trial court did not consider ground B. To construe it otherwise would be to permit and encourage an inference that is neither warranted by the record nor in keeping with the spirit of Rule 166a(c). Accordingly, we conclude that the trial court in the present case did not consider defendants' "substantive-law" argument in deciding to grant the summary judgment. Having reached this conclusion, it appears obvious that a ground not *considered* by the trial court is functionally identical to one not *presented* to the trial court; we

can conceive of no reason to treat them differently.

\* \* \* \* \* \*

\* \* \* We hold that where, as here, a summary judgment order specifies the ground or grounds on which it is based, without expressly ruling on other independent grounds alleged in the motion, such other grounds may not, on appeal, form the basis for affirming the summary judgment. On the basis of that holding, we decline to consider defendants' substantive-law arguments in this appeal.

*Id.* at 518–19 (emphasis in original and footnotes omitted). The cases are legion in which the appellate court asserts that it will not consider issues not previously presented for review by the trial court. *R.O. Corp. v. John H. Bell Iron Mountain Ranch Co.*, 781 P.2d 910 (Wyo.1989); *Demple v. Carroll*, 21 Wyo. 447, 133 P. 137 (1913); *Jones v. Kepford*, 17 Wyo. 468, 100 P. 923 (1909).

At this juncture, little benefit to the bar and bench will be served by my exhaustive review of the subject of actual and ostensible authority since surely history will not reoccur where we make our decision upon an equivalently insufficient record as is done here. May it suffice that even if we now had a concluded trial with only the present evidence available, I would not vote to sustain a directed verdict by conclusion that actual or ostensible authority was not presented to be a question of fact. *Kure v. Chevrolet Motor Div.*, 581 P.2d 603 (Wyo. 1978); *Waisner v. Hasbrouck*, 34 Wyo. 61, 241 P. 703 (1925); *Farmers' State Bank of Riverton v. Haun*, 30 Wyo. 322, 222 P. 45 (1924). It is a generally accepted rule that actual or ostensible authority is a question for factual resolution unless the facts do not provide any evidentiary conflict. *Stone v. First Wyoming Bank N.A., Lusk*, 625 F.2d 332 (10th Cir.1980).

If this dissent serves little benefit in substantively discussing the issue of actual or ostensible authority which was not considered by the litigants or the trial court during all times prior to appeal submission, there is even less benefit, since that is not

a basis now considered in this majority, in now extensively discussing my disagreement with the trial court in regard to the statute of frauds preclusion by which summary judgment was granted. I do not, however, agree with the trial court decision as a matter of law under the developed facts that the partial performance escape from a statute of frauds preclusion might not be available for factual determination by a trial jury. In this litigative event, it is apparent that Safecare Health Service lead Lavoie far down the proverbial primrose path in sharp business dealing. There is clear indication from the affidavits in the record that the agent of negotiation, Ockinga, was following his orders in these activities for the covert, but real, purpose of developing negotiative leverage to reduce the price paid to a competitive source for the laundry services. From this perspective of summary judgment disposition, the question is whether Safecare Health Service went too far to escape the rainstorm of rejected business with the appellant by now being given the benefit in use from the umbrella of the statute of frauds.

Differing from the trial court, I would find in analysis, at least within summary judgment concepts, that this negotiated business deal went too far for Safecare Health Service to ignore what Lavoie had done to handle the promised laundry business. I would clearly find here a jury question of sufficient partial performance to deter pretrial disposition by application of the statute of frauds as a matter of law. The real question presented is how far into a transaction can a sharp-dealing business retain protection under the statute of frauds? This is contended to occur while the promise is clearly practicing a character of fraud on the negotiating party to only obtain a reduced price from someone else and without any actual intendment or commitment to do business. The partial performance feature of this transaction is unquestioned since clearly in good faith and with knowledge and encouragement of the negotiating party, Lavoie incurred substantial expenses by reliance on advice about the expectancy of doing the laundry.

I would follow Lavoie's argument and authority to address this issue:

[T]he "part performance" doctrine would apply to the facts of this case. That doctrine has been articulated by [2 A.] Corbin, [*Corbin on Contracts*] § 459, at 583–84 [(1950)] as follows:

"The true rule is believed to be that, wherever there has been a 'part performance' that is [of] such a character as to make the restitutionary remedy wholly inadequate, and the facts are such that it is what the courts call a 'virtual fraud' for the defendant to refuse performance, equitable remedies are thereby made available to the injured party on the same terms as in other cases. The proof of the oral contract must be clear and convincing, the performance sought must be of a kind that courts of equity ordinarily feel competent to compel, and other similar conditions of the right to equitable relief must exist."

According to Corbin, *supra*, § 425 at 464, the type of part performance which is sufficient to take an oral contract from the Statute of Frauds is described below:

"In order that acts of the plaintiff in reliance on the oral contract may make it specifically enforceable, there are several requisites, each being somewhat variable in character and enforced with varying degrees of strictness by the courts. (1) The performance must be in pursuance of the contract and in reasonable reliance thereon, without notice that the defendant has already repudiated the contract. (2) The performance must be such that the remedy of restitution is not reasonably adequate [* * *]. (3) The performance must be one that is in some degree evidential of the existence of a contract and not readily explainable on any other ground."

See *Butler v. McGee*, 373 P.2d 595 (Wyo. 1962) and *Vogel v. Shaw*, 42 Wyo. 333, 294 P. 687 (1930). *See also Allen v. Allen*, 550 P.2d 1137 (Wyo.1976).

In analysis of briefing before the trial court and now here, it is not necessary to significantly disagree with much of what is

related to recognize that a statute of frauds issue is properly presented which is to be weighed against a partial performance deterrence.[1] The invitation by Safecare Health Service for the bidding supplier to expend significant funds for contract performance leads me to the conclusion that we have an issue of fact case. The trial fact finder should be required to determine by trial whether or not a deal was struck by the statements made and the urging to proceed which was provided by Safecare Health Service. The substance of my disagreement with the trial court is acceptance of a decision by summary judgment where a factual decision was made.

At the very minimum, I conclude that this appeal should have been submitted to the litigants for re-briefing so that they would have had some opportunity to examine and discuss the issue we now decide.

If issues of decision are not to be further developed or even briefed by the litigants before we render a decision, I would reverse and remand for trial.

---

1. In answer to suggestions that Safecare Health Service, as a bargaining party, never got to the minister for the wedding, I would expound the idea that under the circumstances, an advance non-commitment letter provided to Lavoie would have served admirably to give warning and preclude damage to Lavoie. This would have been true, although perhaps not providing the negotiative leverage with the existent supplier, a Casper laundry, which was arguably Safecare Health Service's negotiating factor in extending the original invitation to bid. A non-commitment communication with an invitation to bid simply states that written acceptance of a bid is required to create any obligation and that in advance of the acceptance, *no* occurrence of expenses for anticipated performance would be justified or recognized as a basis for obligation. This is the "when you can perform, we may negotiate" message. In the analogy originally started in this footnote, the subject can be addressed within the profundity of "Do not listen to my words, my intentions are only dishonorable."